McCARDELL et al. v. LEA et al.   (No. 202.)

(Court of Civil Appeals of Texas. Beaumont. Dec. 6, 1917. Rehearing Denied Feb. 6, 1918.)

1. TRESPASS TO TRY TITLE ⬤⟹40(5) — EVIDENCE—ADMISSIBILITY.
   Where appraisers appointed to partition land reported that it could not be properly partitioned, and the administrator applied for leave to sell the lands, and the description in his application and in the report and order of the appraisers was insufficient, but was made certain by his own and many subsequent deeds, the administrator's deed was admissible in trespass to try title to certain of the lands then sold.

2. TRESPASS TO TRY TITLE ⬤⟹47(1)—RELIEF GRANTED.
   In trespass to try title, where defendant counterclaimed for the same relief, and plaintiff entered general denial, and defendant testified to an administrator's sale to him of the land involved, which was sufficiently shown, although he thereby obtained an excess over the amount actually sold, plaintiff could not have the equitable relief of having the sale set aside.

3. TRESPASS TO TRY TITLE ⬤⟹47(3)—DEEDS—CONSTRUCTION.
   Where administrator's sale report showed sale of various acreages "east of Trinity river, in Liberty county," and of 684¾ acres "in Liberty county," to defendant, in trespass to try title, there was no merit in contention that defendant could claim only land east of the river or land shown on the administrator's map of the date of the sale as unsold, though an excess unsold, including the land claimed, was afterwards found.

4. TRESPASS TO TRY TITLE ⬤⟹41(1) — EVIDENCE—SUFFICIENCY.
   Evidence *held* to sustain judgment for defendant in trespass to try title.

5. APPEAL AND ERROR ⬤⟹1011(1)—REVIEW—FINDINGS.
   It is the province of the trial court, when a conflict in testimony appears, to weigh the testimony.

Appeal from District Court, Liberty County; L. B. Hightower, Sr., Judge.

Trespass to try title by W. K. McCardell and others against J. V. Lea and others, wherein defendants filed a cross-action for the same relief. Judgment for defendants, and plaintiffs appeal. Affirmed.

Kittrell & Kittrell and Stevens & Stevens, all of Houston, for appellants. E. B. Pickett, Jr., of Liberty, for appellees.

BROOKE, J. This was an action in the nature of trespass to try title, brought by W. K. McCardell and a large number of other appellants against J. V. Lea and William Long, to recover an undivided $^{53}/_{56}$ interest in and to a part of the J. D. Martinez leagues Nos. 6 and 9, in Liberty county, Tex.; the land sought to be recovered being described and bounded as follows:

"On the north by what is known as Lake Creek Plantation tract, sold by the administrator of the James Davis estate to the heirs of Mary Jane Davis, and by what is known as the C. D. Creath tract; on the west by the C. B. McCardell tract and the Annie E. Searcy tract; and on the east by the Trinity river."

Defendants answered, first, February 9, 1916, by general demurrer and general denial, and by amended answer on August 30, 1916, renewing their former pleadings, and entering a cross-action describing the same property as plaintiffs sued for. To the last pleadings plaintiffs replied by general denial.

On trial had, after much testimony was heard, judgment was entered that plaintiffs take nothing by their action, and that defendants Lea and Long go hence without day and recover their costs. It was further decreed that on his cross-action the defendant J. V. Lea have and recover all the land sued for by plaintiffs and sought to be recovered by cross-action by said Lea and for writ of possession and for all costs.

On September 1, 1916, plaintiffs filed their motion for new trial, which motion was on said date overruled, and plaintiffs excepted to said action, and in open court gave notice of appeal, and the case is now before this court for review.

The first, second, and fourth assignments of error will be considered together, and they are as follows:

"(a) The court erred in admitting in evidence, over the objection of the plaintiffs, the report of the commissioners of partition in the matter of the estate of Jas. Davis, deceased, of date July 9, 1875; and the order of the court approving the report of said commissioners, and direct-

ing the sale of certain lands in the J. D. Martinez survey, which order is dated the 9th day of July, 1875; the so-called report of the administrator filed November 6, 1875, purporting to sell lot six, containing 684¾ acres—for the reason that said proceedings on their face show that said property was not directed to be sold for the purpose of paying debts, that the probate court had no authority to direct the sale of same upon a report of a commissioner of partition, since the probate court had no equity jurisdiction, and because the proceedings on their face show that no application was ever filed and no citation was ever issued upon application to sell the real estate attempted to be described in said orders.

"(b) The court erred in admitting in evidence the order of sale of date July 9, 1875; the report of sale, dated October 3, 1875, and filed November 6, 1875, in the district court of San Jacinto county, Texas, which proceedings were offered by the defendants—for the reason that said so-called order of sale and said so-called report of sale failed to describe any land and particularly failed to describe the land in controversy.

"(c) The court erred in rendering judgment for the defendants because there was no valid sale shown to the defendant by the administrator of the estate of James Davis, deceased, of the property in controversy, as shown by the first and second grounds of error above set forth."

Under the above assignments is the following proposition:

"Where, in the report of the commissioners and in the order of sale, the only description of the land in Martinez league was 2,145 acres east side of Trinity river et cetera, and 2,739 acres west side of Trinity river et cetera, and where the report of sale showed a sale to one purchaser, defendant (appellee J. V. Lea), of five lots, to wit, 2, 3, 4, 5, and 6, containing, respectively, 631, 621, 618, and 269, also 684¾ acres, aggregating 2,823¾ acres, all east of the Trinity river, and where it was uncontradicted that all of the land east of the river was sold, and that appellee Lea bought most of it and resold it, the orders and decrees objected to were wholly inadmissible to show title in said Lea (appellee) to land west of the river, and to admit such evidence was prejudicial and fundamental error, especially where it was made the basis of a judgment for 1,421 acres of land, which 1,421 acres was by all of the evidence introduced in the case not even known to the administrator to exist, and being more than twice as much land as the order of sale and the decree of confirmation described or purported to affect."

It is contended, on the other hand, by appellees, that where land is sold by an administrator, and the description given in the application for sale, the order of sale, the report of sale, and the order confirming the sale, or in either of said documents, is meager and indefinite, such description may be aided by applying extraneous evidence to the description as given, and to so aid the description reference may be made to the entire record in such administration, and parol testimony as well may be received for the same purpose.

Appellees' second counter proposition to appellants' first, second, and fourth assignments of error will be considered together with the original counter proposition heretofore set out, it being as follows, to wit:

"In the proposition on page 5 of appellants' brief there appears the statement that the report of sale showed a sale to J. V. Lea 'of five lots, to wit, 2, 3, 4, 5, and 6, containing, respectively, 631, 621, 618, and 269, also 684¾ acres, aggregating 2,823¾ acres, all east of the Trinity river'; and again on page 7 of said brief, showing appellants' objection to the admission of the report of sale in evidence, there appears this statement: 'It is not stated it is in leagues west of the Trinity river, and nothing to show that it is a part of the land in controversy;' and also on page 13 of said brief, in appellants' ninth assignment of error, the statement is made that the report of sale 'introduced in evidence showed that lot No. 6 purchased by him (J. V. Lea) was situated east of the Trinity river and not west of the Trinity river, and therefore was not in the grants of land in which said defendant claimed said land to be situated'; but each and all of those statements to the effect that the report of sale filed by the administrator on November 1, 1875, failed to show that the land in controversy was on the west side of the Trinity river, or that said report of sale showed this land to be on the east side of the Trinity river, are seriously inaccurate, for the fact is that the report of sale clearly showed that this tract of land (lot No. 6), called in said report of sale to be 684¾ acres, was on the west side of the Trinity river, and further clearly showed that the only land on the east side of the Trinity river bought at that sale from the administrator by J. V. Lea were those parts of the land sold at that sale by the administrator, described as lots Nos. 2, 3, 4, and 5, and therefore appellants' attack upon this administrator's sale, which is based upon the contention that the report of sale showed that all the land sold J. V. Lea at said sale was located east of the Trinity river, is not supported by the record, and it was not error for the trial court to admit extraneous evidence for the purpose of definitely describing the tract of land west of the Trinity river which in fact was sold to J. V. Lea at the administrator's sale occurring on the first Tuesday in October, 1875, such extraneous evidence so properly admitted consisting of not only said report of sale, but other proceedings of the administration, and also the testimony of J. V. Lea, who was personally present at the sale and familiar with the facts."

It was agreed that Gen. James Davis died in the early part of 1859, and at the time of his death he owned leagues Nos. 6 and 9 of the Jose A. Dolores Martinez (eleven) league grant in Liberty county, and a part of league No. 1 of the same surveys, situated in Liberty county, and also various other lands situated in other counties in Texas. But this agreement seems to have been modified by proof which both parties offered showing that during his lifetime Gen. James Davis sold to Reason Green a 320-acre tract out of league No. 6, and located upon the south line of that league, and a tract of 640 or 649 acres to his son, James K. Davis, the greater part of which is out of league No. 9, but the southern end of same is located upon league No. 6; and, therefore, to accurately locate and definitely describe what land was in fact sold by the administrator's sale which occurred on the 5th day of October, 1875, there was offered the following documentary evidence and parol testimony, to wit:

On March 7, 1874, J. H. McCardell, as administrator of said estate, filed a report describing the lands belonging to said estate at that date, as follows:

"Lands on hand undisposed of and subject to distribution among the heirs and distributees, to wit:

| No. Acres. | Headright or Survey. | And Where Located. |
|---|---|---|
| 540 acres, | J. D. Martinez, | Near Cold Springs, San Jacinto Co. |
| 37½ acres, | Kincaid, | Also San Jacinto Co. |
| 2,145 acres, | J. D. Martinez, | East side of River Trinity, in Liberty Co., 'White Oak League.' |
| 2,739 acres, | J. D. Martinez, | West side of said river, in Liberty Co. |
| 1,616 acres, | J. R. Jones, | In Angeline Co., east bank of N u c h e s river (subject to a probable deduction of 404 acres on account of disputed title). |
| 575 acres, | Richard Lanham, | Cook Co. |
| 2,725 acres, | being a locative interest in divers surveys located in different counties of the state, chiefly on the Brazos river, resulting from verbal contracts by the deceased with the original grantees named in the certificates finally executed through the agency of Charles Buckholt, with whom the said deceased had a written agreement, but the exact fruits of which this administrator has never been able to arrive at in any form more definite than is here stated, but which at the suggestion of his counsel he here shows for what it is worth." | |

The said report also gives the names of all the heirs and distributees of said estate, and then proceeds:

"That in order to effect a settlement of said estate, a partition and distribution of said land has become necessary among the said heirs and distributees. That by the law of descent and distribution they are entitled as follows: Jack Davis, James Davis, Mrs. C. D. Creath, and Mrs. M. S. McCardell are each entitled to one-sixth part of the whole; the heirs of Mrs. C. B. McCardell above named, eight in number, are all taken together, to one-sixth part of the whole; and Mrs. Anne E. Searcy, Alice Henderson, and Lillian Elgin, all taken together are entitled to one-sixth of the whole. That in order to effect the final settlement of this estate, an application for which has been so long pending on his final account, of which this (showing the property left on hand of this administrator, the same being land only) is asked to be considered part, he prays the usual notices and citations may be duly given and such order made in the premises as to your honor may seem meet.

"J. H. McCardell, Adm'r,
"By Davis, Atty."

On July 9, 1875, an order was made by the probate court for the partition of the lands belonging to said estate, and appointing commissioners to make such partition, that order in full reading as follows:

"The Estate of James Davis, by J. H. McCardell, Adm'r. Order of Partition of Land.

"July the 9th, 1875.

"In the matter of this estate this application for partition of the lands belonging thereto, hereafter mentioned, among the heirs and distributees of said estate, hereafter named, again coming on to be heard, and it appearing that all persons interested in the said estate as heirs and distributees or part owners thereof have been duly cited, and that citation posted to all persons interested in the administration of said estate has been duly given, and no objections have been made thereto, but all parties being represented and consenting thereto:

"It is ordered that T. L. Ross, J. A. Dupree, Z. T. Ross, and J. T. Liles be, and they are hereby, appointed commissioner to divide the following described land, to wit:

| No. Acres. | Headright or Survey. | Location. |
|---|---|---|
| 540 acres, | J. D. Martinez, | Near Cold Springs, San Jacinto Co. |
| 37½ acres, | Kincaid, | Also San Jacinto Co. |
| 2,145 acres, | J. D. Martinez, | East side Trinity river, Liberty Co., 'White Oak League.' |
| 2,739 acres, | J. D. Martinez, | West side of said river, in Liberty Co. |
| 1,616 acres, | J. R. Jones, | In Angelina Co., east side Neches river. |
| 575 acres, | Richard Langham, | In Cook Co. |
| 2,725 acres, | locative interest in divers counties, chiefly on the Brazos river, | |

—"among the following named persons, heirs and distributees of said estate in the shares and proportion following, to wit: That is to say, one-sixth part of the whole to the following named: James Davis, Jack Davis, Mrs. C. D. Creath, wife of J. W. D. Creath, Mrs. M. V. McCardell, wife of J. H. McCardell; and one-sixth of the whole to the following names: Mrs. Annie E. Searcy, wife of O. O. Searcy, Miss Alice Henderson and Lillian Elgin, the descendants of Mrs. Mary Henderson, deceased; and one-sixth of the whole to the following named: B. McCardell, J. A. McCardell, J. H. McCardell, Jr., K. H. McCardell, Davis McCardell, Ann Eliza McCardell, Anna Eliza McCardell, Katie McCardell, and Douglass McCardell, being the descendants of Mrs. C. B. McCardell, deceased; and who, after fairly dividing said lands among said parties according to the terms of this order, will make report of their actions to this court under oath, showing therein the appraised value of each share allotted, and to that end the clerk will issue the usual commissions in such cases required."

Then the commissioners appointed by said order filed a report on July 9, 1875, in said estate, reading in full as follows:

"The State of Texas, San Jacinto County.

"To the Hon. the District Court of the County and State Aforesaid:

"The undersigned commissioners appointed by your honor to make partition of the following land belonging to the estate of James Davis, decd., to wit:

| No. Acres. | Headright or Survey. | Location. |
|---|---|---|
| 540, | J. D. Martinez, | Near Cold Springs, San Jacinto Co. |
| 37¼, | Kincaid, | Also San Jacinto Co. |
| 2,145, | J. D. Martinez, | East side of River Trinity, in Liberty Co., 'White Oak League.' |
| 2,739, | J. D. Martinez, | West side of said river in Liberty Co. |
| 1,616, | J. R. Jones, | In Angelina Co., east side of Nuches river. |
| 575, | Richard Langham, | In Cook Co. |
| 2,725 | Locative interest in | divers counties, chiefly on the Brazos river. |

—"after having taken the matter of the said partition under consideration, beg to report to the court that, to the best of their knowledge and information, judgment, and belief, the said lands are of such character and so situated

that they believe no just division of them among the heirs or distributees of said estate can be made without diminishing the value of said lands, and that division thereof is inconvenient and impolitic.

"They further say that they have no interest in said partition, and are not of kin to any of the parties to said partition or division.

　　　　　　　　　　　"J. A. Dupree.
　　　　　　　　　　　"Z. T. Ross.
　　　　　　　　　　　"T. L. Ross.
　　　　　　　　　　　"J. T. Liles.

"Sworn to and subscribed before me this July the 9th, 1875.

　　　　　"G. B. Byrd, C. D. C. S. J. C.

"Indorsements: Estate of James Davis, by J. H. McCardell, Adm'r. Report of Commissioners in Partition of Lands. Filed July 9/75. G. B. Byrd, Clerk."

Upon that report of said commissioners, the court, on July 9, 1875, entered the following order:

"The Estate of James Davis, by J. H. McCardell. Report of Commissioners.

　　　　　　　　　　"July the 9th, 1875.

"In the matter it is ordered that the report of the commissioners, J. A. Dupree, J. T. Liles, Z. T. Ross, and T. L. Ross, this day returned into open court, showing that the lands heretofore ordered to be divided cannot be fairly distributed, and that a division thereof would be inconvenient and impolitic. It is ordered that the same be received, and is hereby approved and confirmed, and directed to be filed and recorded.

"And on consideration of the premises, no good cause being shown to the contrary, but, on the other hand, it appearing to be to the interest of said estate, and the heirs and distributees thereof and all parties interested having due notice and being represented and consenting thereto, it is ordered and decreed that the said lands, viz.:

540 acres, near Cold Springs, in San Jacinto Co.
37¼ acres, also near Cold Springs, in San Jacinto Co.
2,145 acres, J. D. Martinez, east side Trinity river, in Liberty Co., 'White Oak League.'
2,739 acres, J. D. Martinez, west side said river, in Liberty Co.
1,616 acres, J. R. Jones, east side Neches river, in Angelina Co.
575 acres, Richard Langham, in Cook Co.
2,725 acres, locative interest in divers counties, chiefly on Brazos river, known in this estate as 'Buckholds Land,'

—"be sold by the administrator for cash on the first Tuesday in October next before the courthouse door in the town of Cold Springs, within the legal hours at public outcry, to the highest bidder, and that said administrator make due report of his actions hereunder. * * *.

"The above and foregoing order or judgment was recorded in Book A on page 440 of the Minutes of District Court of San Jacinto County, Texas."

The report of sale made under the foregoing order was filed by the administrator on November 1, 1875, and was in full as follows:

"In District Court of San Jacinto County. The Estate of James Davis, deceased, by Jas. H. McCardell, Adm'r.

"To the Honorable J. R. Burnett: The undersigned administrator of the aforesaid estate presents to the court the following report of sale of lands belonging to said estate made on the first Tuesday in October, inst., within legal hours at public outcry, in the town of Cold Springs, in San Jacinto county, before the courthouse door thereof, after having first given legal notice of the time, place, and terms of the same as prescribed by law in such case, and in pursuance of the order of your honorable court in the matter of said estate at the last term thereof, to wit:

| Lot. | Lands Sold. | Purchaser's Name. | Price. |
|---|---|---|---|
| No. 1. | 37½ acres, | Kincaid tract, to James Hogue, for.. | $ 251 43 |
| No. 2. | 631 acres, | Martinez grant east of the Trinity, in Liberty county, J. V. Lea, for......... | 63 10 |
| No. 3. | 621 acres, | of same to the same, J. V. Lea, for...... | 68 10 |
| No. 4. | 618 acres, | of same to the same, J. V. Lea, for...... | 61 80 |
| No. 5. | 269 acres, | Martinez, east of Trinity river, in Liberty county, to J. V. Lea, for...... | 29 59 |
| No. 6. | 684¾ acres, | same to the same, for ................ | 68 49 |
| No. 7. | 684 acres, | same to James Davis, for ............. | 61 52 |
| No. 8. | 684¾ acres, | same to G. B. Byrd, for ................ | 61 62 |
| No. 9. | 1,616 acres, | J. R. Jones H. right, in Angelina county, to James Davis, for ................ | 177 76 |
| No. 10. | 575 acres, | Richard Langham, H. D., in Haskell county, formerly Cook county, to J. A. McCardell, for.. | 143 75 |
| No. 11. | 684¾ acres, | Martinez, W. Trinity, in Liberty county, to A. E. Searcy .............. | 68 47 |
| No. 12. | | Being locative interest in divers surveys in different counties known as the Buckholtz matter, see past exhibit and order of sale, *and —— to James Davis, for.. | 101 00 |
| No. 13. | 540 acres, | Martinez, near Cold Springs, in San Jacinto county, for... | 1,004 40 |

　　　　　Total sales ....... $2,155 10

"Terms of sale being cash, and the title and interest of said estate in and to some of said lands being doubtful, the same is submitted for your honor's approval.

　　　　　　　　　　"J. H. McCardell,
　　　　　　　　　　"Adm'r Est. J. Davis.

"Sworn to and subscribed before me the 30th day of October, 1875.

　　　　　　　　　　"T. F. Meece,
　　　　"Clerk Dist. Polk Co., Texas.
　　　　2,155.11
　　　　　198.10
　　　　————
　　　　1,957.01

"Indorsements: Estate of James Davis. Report of sale of lands made Oct. 5th, 1875. Filed Nov. 1st, 1875.

　　　　　"G. B. Byrd, C. D. C. S. J. Co.

"* Error: See amended report filed Nov. 6, 1875. Davis."

The said amendment to said report was filed on November 6, 1875, being as follows:

"In District Court San Jacinto Co. The Estate of James Davis, Decd., by James H. McCardell, Adm'r.

"To Hon. J. R. Burnett: The undersigned administrator of the aforesaid estate begs leave to file this as an amendment to and correction of his report of sale of lands made on the first Tuesday in October last.

"He shows to the court that there is mis-

take in his report in this, that in his report there appears to have been sold 540 acres of land in the Martinez tract, near Cold Springs, when in fact there was only 455 acres at one & $^{00}/_{80}$ dollars per acre, amounting to only $846$^{30}/_{100}$ dollars, instead of one thousand and four $^{40}/_{100}$ dollars.

"Wherefore he asks that his original report be corrected according to the fact herein shown.
"J. H. McCardell, Adm't Est. J. Davis.
"Sworn to and subscribed before me the 6th day of Nov. A. D. 1875.
"G. B. Byrd, Clk. D. C. S. J. Co.
1,004.40
846.30
———
Error   198.10
2,155.11
———
1,957.01

"Indorsed: Est. Jas. Davis. Supplement report sale of lands.
1,957.01.
"Filed Nov. 6/75.
"G. B. Byrd, Clk. D. C. S. J. Co."

On November 6, 1875, the court confirmed said report of sale, its order of confirmation being in full as follows:

"Estate of James Davis, Dec'd., by J. H. Mc-
Cardell, Adm'r.

"In the matter of this estate on this November the 6th, 1875, came on to be heard, administrator's report of sale of land made in pursuance of an order of this court, said report having been filed on this —— of November, 1875, and amended this day, and it appearing to the court that said report and amended report are duly sworn to and that same was legally and fairly made and no exceptions have been filed thereto. It is therefore ordered and decreed by the court that said report as amended be approved and said sale be in all things confirmed, and that the administrator make title on the purchasers' complying with the terms of sale. It is further ordered that said report and amendment be recorded in the probate records of the court, and the same is here referred to for the name of purchasers and description of said land sold, price, etc.

"It is further ordered that the exhibit for final settlement of this estate be continued until next term of this court. * * *

"The above and foregoing order and judgment was recorded in Book A, the first on page 462, and the last on page 464, of the minutes of the district court of San Jacinto county, Texas."

J. V. Lea, appellee, testified that he is a grandson of Gen. James Davis, his mother being Catharine Davis, a daughter of Gen. James Davis, and after her marriage to J. W. Creath she was known as Catharine D. Creath; that the appellee William Long is his tenant upon the land in controversy, having been such tenant upon the land in controversy since 1905; that in 1870 he lived in Cold Springs, and was intimately acquainted with Dr. J. H. McCardell, who was the administrator of the estate of Gen. James Davis.

"I recall at a sale in the latter part of the year 1875—October, 1875. That sale took place at Cold Springs. I purchased land from the administrator at that sale. Dr. McCardell executed me a deed for the land purchased. I don't know what became of the deed; I have searched for it everywhere. I don't know whether it was recorded in Liberty county before the records were burned in 1874. I made every sort of search for it everywhere. * * *

The deed from Dr. McCardell was delivered to me. I am an attorney at law; have been ever since along in the 70's. I recall that the deed was acknowledged. It was signed by the administrator, signed J. H. McCardell, administrator of the estate of James Davis, and acknowledged before G. B. Byrd, clerk of the court. I recall how the land conveyed was described. The first land that was sold at that sale was 684¾ acres to Annie E. Searcy. Then there was a tract of land sold to G. B. Byrd of 684¾ acres, and to James K. Davis of 684 acres. Then a small tract sold to a man named Johnson, I believe 40 acres; then the balance unsold portion was sold to me, estimated at 684¾ acres.

"The deed to me described the land lying between Lake Creek plantation, J. K. Davis tract, C. B. McCardell tract, C. D. Creath tract, which is the Hume tract, and Trinity river and the Searcy tract. The J. K. Davis tract and the C. B. McCardell tract bounded this tract which was sold to me on the west; the Lake Creek plantation and the C. D. Creath tract bounded it on the north."

"Q. On the south what tracts of land bounded the tract you bought? A. It was to be north of the Searcy tract. The sales were made in the order I have named, and on the day of sale, and reported to the court, subsequent term of the court—that was the understanding; the next term of the court had to approve it. The C. B. McCardell tract lies to the south and a little to the west of the tract I bought. The Trinity river bounds on the east the tract that I bought. I made the purchase about which I have testified on the first Tuesday in October, 1875, at Cold Springs. Before you get to that I want to state that I paid for this land, too. I paid it to the administrator; since that time I have always claimed the land. I heard some talk about the matter of a contrary claim by the Davis heirs before this suit was brought. * * * Well, it has been some ten or twelve years ago, after the contract was made with Mr. Mansfield with respect to recovering the land that was sold—unsold—that the administrator had not sold; why, I heard some discussion about this, as to whether or not my title was good. I had never heard any controversy as to my title until the heirs of Gen. Davis had entered into a contract with Mr. Mansfield—none whatever, and I do not believe they assert it now; I do not believe they claim it now. The Byrd tract, the J. K. Davis purchase, and the Searcy purchase have never been claimed by any one so far as I know. I know where they are on the ground. The Searcy tract was sold to McDonald, and has been in litigation in this court, I think. I have never heard any of the Davis heirs or anybody else claiming adversely to the people that bought the sales that took place on the same day when I bought. I know where the Byrd tract is. I know where the J. K. Davis tract of land is on the ground. I recall the transaction definitely which involves the lands referred to in the report of sale of the administrator on the first Tuesday in October, 1875, this report referring to lot 1, 37½ acres, Kincaid tract; then lot 2, 631 acres Martinez grant east of the Trinity river, J. V. Lea for $63.10; lot 3 calls for 621 acres, Martinez, same to same, that is to me, J. V. Lea, for $68.10; lot 4, 618 acres, same to same, J. V. Lea, for $61.80; lot No. 5, 269 acres, Martinez east of Trinity river, in Liberty county, to J. V. Lea for $29.50. I am the J. V. Lea referred to in that report. I bought those lands as that report recites. The deed was made for them. I afterwards claimed and sold parts of that land. I sold the land on the east side of the Trinity river to Mrs. McCardell. I sold one half to Mrs. M. S. McCardell. I sold the other half to Mrs. Henry. I haven't seen it for years, but my recollection is that instead of making the deed to John L. Henry, he asked me to make

the deed to his wife to avoid the claim of limitation should squatters locate on it, and my recollection is that he had the deed made to his wife, but I haven't see it in 40 years. I knew at that time that limitation would not run against a married woman. My recollection is that I made the deed at the suggestion of Mr. Henry to his wife. I did not purchase any other land on the east side of the Trinity river at that same sale other than the land I sold to Mrs. McCardell and Mrs. Henry. That is all; that was all the land there was there to purchase. There was no other land there to purchase that we know anything about. I bought no other land on the west side of the Trinity river at that same sale except the 684¾ acres which has been inquired about; that is all I bought west of the river. In the report of sale there is this further recital, after the recital of lot No. 6, which I have testified about, as follows, 'Lot 7. 684¾ acres, to James Davis,' and I recall that that sale occurred there that day. I recall that James Davis got a deed to that 684¾ acres. Lot No. 8, 684¾ acres, to G. B. Byrd. I recall that G. B. Byrd got a deed to that. These tracts were in league number 9. They might have been a part of the land on league number 9. They might have been a part of the land on league 6, but my recollection is that it was close to league 6. Those leagues lay parallel to each other; league 9 is north and league 6 is south. As far as I recall, part of it may be on league 6. These Byrd and Davis tracts are on the west side of the Trinity river. Lot 6, referred to as 684¾ acres, was sold to me at that time. I paid the consideration, and the money was apportioned among the heirs of the estate; none of it was ever returned to me. My mother inherited as her portion of the estate whatever interest was coming to her. I think it was small, not over $138 or $140. I don't remember, but, whatever it was, I have claimed this land since that date. I have sold about 40 acres of it."

"I sold part of it to an oil company; I suppose the deed will show. I think it was 40 acres only was sold to Beatty, and I think I sold Dannenbaum a small tract, about 40 or 50 acres in all. I leased part of the tract to that oil company. My recollection is it was 20 acres, but the lease is there; it possibly might have been more. I never heard the McCardells or the plaintiffs in this suit make any claim to this land prior to the time the heirs made this power of attorney to Mansfield."

"Mrs. C. B. Martin told me that Aunt Nug (Mrs. M. S. McCardell) had accused Martin of trying to beat some of the Davis heirs out of some land, and she (Aunt Nug) had been informed that I was aiding him. Plaintiffs: We object to any conversation between you and an outside party. Court: Go ahead. Plaintiffs: Note our exception.

"When Martin's wife made that statement to me I went back home and told my wife I was going to see Mrs. M. S. McCardell. She said, 'I just got a letter from Aunt Nug that she will be down here to-morrow or in a few days.' As soon as she came to my house, as she usually stayed with us, and I told her what I had heard, then she said, 'Yes; she had made those remarks.' She was a very positive woman; said what she thought and felt with anybody—she was that kind of a woman. I explained to her; I said, 'Now the dispute is between the Santos Coy and the Martinez grant.' Martin was attorney in the case. I came into the courtroom and walked out, and never opened my mouth, and never made an appearance in the case; and had never been consulted about it. I said the only land I own is the land I bought from Dr. McCardell at the administrator's sale in 1875, and described it to her, and I said, 'You know that I bought that land and paid for it.' She said she expressed her entire satisfaction with it, and said she thought it belonged to me and

I ought to have it, and she would not have it under any circumstances. I explained to her what land I had bought for her at the instance of the administrator, Dr. J. H. McCardell, who was her husband, he suggesting that I buy that part of the land one-half for myself and one-half for his wife, my aunt. I had made her a deed to one-half of the land on the east side of the river, 2,000 acres, something about 2,000 acres, what these tracts aggregated, I know. After the sale Dr. McCardell said his wife wanted her part of the land, and I made her a deed for her half of the land, which was east of the Trinity river, and my half sold to Mrs. Henry. I bought at other sales before the sale made in 1875, by agreement with her and Dr. McCardell, other lands, and deeded back to her part of what I bought. I bought the Clark Beach land in Montgomery county, and the Pressly Gill in Montgomery. I made those purchases in part for myself and in part for Mrs. McCardell. At the time of this conversation with Mrs. M. S. McCardell I told her what land and the only tract of land I was claiming in the Martinez league. She made absolutely no claim against me; she thought it was all right."

On cross-examination the appellee Lea further testified:

"I told her I claimed 640 acres. I did not make any description of it except to tell that the land was sold to me at administrator's sale, at the same sale when I bought the land which I afterwards sold her one-half of, made at the same sale, and also the land in Cold Springs, the old homestead and place I bought and deeded to her one-half of it, and my mother one-half, made under the same order of sale."

"The lost deed which I proved was never recorded in Liberty county. I have never been able to find it if it has been. I cannot say whether I ever sent it for record; don't think so. I know some of the deeds; one deed was executed about the same time that the administrator made a deed for it. My recollection is that the deeds to the land east of the Trinity river executed the same day were recorded here, and I thought the other one was recorded here. I won't say that they were all executed the same day. I say this, I said the day of the sale they executed deeds to Mrs. Searcy, to Mr. Byrd, and to myself and Jim Davis. I was present and saw it executed to Jim Davis. I saw the deeds prepared, but whether they were executed on that particular day I could not determine. My recollection is, Judge, mine was not executed on that day. They were prepared on that day. It was executed in a few days, not less than a week from the time. You see it required considerable time to prepare the deeds. Dr. McCardell lived at Livingston and this sale was at Cold Springs. My recollection of the Green Byrd 684¾-acre tract was that it was league 6 or 9. My recollection is that it was on number 6. I could not tell you how it was described. We got a board up there, and marked these tracts of land as well as it could be done by sections. I think the deed to me was called No. 6—was the purchase I made; the others were numbered as they were reached. They sold in this order. The Searcy was sold first. I cannot tell you the sections after that. Dr. McCardell was anxious to get a piece of land to satisfy Mrs. Searcy, and had some one to bid it in for her. She had filed some sort of a suit up there at Livingston against the administrator. I think they sold first lot 11."

"It was made in what is known as an office survey, and we took the report of the commissioners and the evidence of Dr. McCardell as to where this land was and as to the amount of it, and it was divided up in such a size portion as he thought the land contained and marked it out on this blackboard. I do not know whether I can tell why it is fractional acre called for in these three tracts of 684¾

acres. I cannot say except when you divide the unsold land into so many tracts it makes that much. I cannot describe lot No. 2 of 631 acres. You will find that all that land sold was sold in the manner I have described to you, and my recollection is that the deed to me for the land east of the river was made in one deed. My recollection is the land east of the river was made in one deed. The best way it would be described by—now that land across the river they had attempted to sell it at a previous time; you know the law required when an executor sold land he had to cut it up in 40 acres under the statute of 1870—that is my recollection of that date—under execution sale or administrator's sale they had to cut up that property in 40-acre tracts. They had at one time attempted to sell that land on the east side of the river in that manner, and it was bought in by Judge Grosson, and afterwards set aside on the theory that he was county judge. My recollection is about these lots east of the river in the Martinez which I bought were conveyed to me in one deed. My recollection is it was written on the same day, but whether it was executed on that same day I don't know; I could not say positively. My recollection is that lot 2, 631 acres, conveyed to me on the east side of the Trinity river, for $63.10, was in one deed with the other lots east of the Trinity river, which was described as unsold balance; but whether or not when I sold to my aunt there was any metes and bounds, I have no definite recollection."

"I know the ground where by survey is; I know the J. K. Davis place; I know my mother's land. I know where the creeks lay there. I know where the C. B. McCardell tract lay there. I know where the Trinity river is. I know where the Lake Creek plantation was, and I know where the J. K. Davis plantation was. I know where the Hume tract was. The first recollection was I filed a suit in the 80's against a man named Cannon for trespass. I only knew the Hume tract in 1875 as a tract of land that had been sold by J. H. McCardell, administrator, to my mother in the sixties; it was described there and plainly marked on the ground. The Searcy tract was sold on the same day this 684¾ acres was sold to me. The Searcy tract was still above the Jager's tract. This blackboard proposition showed the land sold off. It showed the Moore tract; it showed the D. L. Jager's tract; it showed all the Williams; and it showed the different tracts that had been sold. They had everything that we could get. They had some kind of sketch made by some of the surveyors, had one as big as that table there; they had no smaller ones. I suppose a small one had been made, and possibly the administrator might have had it. I don't know. I know, in estimating the size of those tracts, it was discussed by the administrator and all of us about what it contained between those boundaries."

"I claimed within those boundaries. I claimed the land in controversy. You have the deeds there; you have the C. W. Robinson deed. I claim 684¾ acres by virtue of that purchase. I don't know that there is 1,400 acres. There is not 1,400 acres. I know that; I do know it, unless you take off the excess of the Hume tract. You make the estimation yourself. You look at the deeds. You have the deed to me calling for those two tracts estimated at 684¾ acres. The administrator sold all that there was there as the unsold remnant, and his report shows it. As to lots 6, 7, and 8, they could not be contiguous, because the land does not lie that way. There is land between them. I do not contend that there was not enough land on the west part of the leagues to make three 684-acre tracts there. But I know that it was estimated by the administrator at the time of the sale that there was not enough there, and that was the report of the commissioners appointed for that purpose. I heard afterwards there was an excess on the west portion of the lands, and I signed a power of attorney with that understanding that there was some land there to be recovered. At that time of the sale we did not know; the administrator did not know it. He thought he had sold all the land and everybody else thought it. The idea was to sell 2,739 acres west of the river. As regards 2,739 acres west of the river, multiply 684¾ by 4; what does it make? That is what he reported. That was the statement of the administrator and his judgment about it and the best judgment he had in estimating it at the date of the sale; the best we could from the sales which had been made. I never in my life that I know of described the land to Mansfield. * * * Why certainly it has been known by everybody that made any investigation of it. Mr. Mansfield knew it. The only claim I ever heard that he or plaintiffs had been making to this land is that you don't deny the land belongs to me, but you claim it was on the other side of the river; that has been the only thing I ever heard asserted to it. You admit I own the land, but it ought to be on the east side of the river instead of on the west side."

Further, Lea testified that, when the administrator was selling lands,

"I remember we had a big board, and put the different tracts on it. Yes, sir; we had a big blackboard. I think Mr. C. B. Albea; Mr. Albea made one, I think Mr. Byrd made one, and of course I helped all I could, but I never was much hand on drawing. The administrator was certainly there, J. H. McCardell, and J. A. McCardell was there. There was different plats on the board that was made by the administrator and Mr. Byrd on a big blackboard. We had chalk there. We discussed all the land that they sold that day. They drew them on the blackboard with white chalk. It was sold just like the rest of the estate was sold."

It was agreed by all parties to this suit that there is no deed of record from J. H. McCardell, as administrator of the estate of General James Davis to G. B. Byrd, one of the purchasers named in the above copied report of sale filed on November 1, 1875; the description of the land so sold G. B. Byrd being given in that report of sale simply as follows: "Lot No. 8, 684¾ acres; same to G. B. Byrd, 61.62." But there is of record from G. B. Byrd to Robert L. Mulford, dated December 14, 1875, filed for record March 1, 1876, and recorded in volume A, page 749, Liberty county records, and this deed offered in evidence by appellees reads as follows:

"Know all men by these presents that I, Green B. Byrd, of said state and county, for and in consideration of $684.00 to me paid by Robert L. Mulford, of the city of New York, by these presents do grant, bargain, and sell and convey unto the said Robert L. Mulford, heirs and assigns, the following described property, viz. 684¾ acres of land out of the league No. 6 of the lands granted to Jose Dolores Martinez, situate in Liberty county:

"Beginning at the S. W. corner of said league; thence north to corner of 684¾ out of same league conveyed to Jas. Davis; thence east with said Davis line to corner of same, with a 684¾-acre tract out of same owned by Annie E. Searcy; thence south said Searcy's line to the south line of said league; thence west with said south line to the place of beginning—containing 684¾ acres of land, and it being the same conveyed by order of court to me and in the matter of the estate of Gen. James Davis."

And the said report shows sales of tracts of land to James Davis and A. E. Searcy, as follows:

"Lot No. 7, 684 a., same to James Davis for 61.52. * * * Lot No. 11, 684¾, Martinez, W. Trinity, in Liberty county, to A. E. Searcy, * * * 68.47.".

And appellees offered in evidence deeds for said lands so sold to James Davis and A. E. Searcy, the deed to James Davis being dated April 4, 1876, and reading as follows:

"Know all men by these presents, that I, James H. McCardell, the duly appointed and legally qualified administrator of the estate of James Davis, deceased, resident of the county of Polk, in said state, by virtue of an order of the probate court in and for the county of San Jacinto, ordering me as administrator aforesaid entered upon the minutes of said court at the July term, A. D. 1875, to sell among other lands the following described tract of land, being part of league No. 6 of an eleven league grant to J. D. Martinez, in the county of Liberty, in said state: Beginning at the southeast corner of survey of 320 acres made off of said south line of said league to the S. W. corner of a survey made for G. B. Byrd of 684 acres off said league; thence north, with said Byrd's west line, to H. Johnson's; thence, with said Johnson's east line, to the S. W. line of a survey made for D. D. Moore, and being the S. E. course to the S. W. corner of another survey made for D. D. Moore, and being the S. E. corner of the first-named D. D. Moore survey; thence from said S. W. corner to the N. W. line of the first-named survey for Reason Green; thence south, with said Green survey, to the place of beginning, so as to contain 684 acres of land, together with all and singular the rights, members, and appurtenances to the same belonging, or in any wise incident or appertaining, after advertising the said land according to law, and at public auction at the door of the courthouse, within the legal hours of sale, on the first Tuesday in October, A. D. 1875, did sell said land to Jack Davis as trustee for James Davis, as provided in the will of the late General James Davis, deceased, for the sum of sixty-one and $62/100$ ($61.62) dollars, he being the highest and best bidder for the same, and said sale being duly returned, was received and confirmed by the said court at the November term, A. D. 1875, as appears from the minutes of said court recorded in Minute Book 'A,' page 464, as an order passed thereon directing me as administrator to make a conveyance' to the purchaser of said land. Now, therefore," etc.

And the said deed to Mrs. Annie E. Searcy is dated January 1, 1876, and reads as follows:

"Know all men by these presents, that I, James H. McCardell, resident of the county of Polk, in said state, and duly appointed and legally qualified administrator of the estate of James Davis, deceased, by virtue of an order of court issued at the July term, A. D. 1875, do sell, among other lands, the following described tract:

"Beg. on the west bank of the Trinity, at the N. E. corner of a tract sold off the same league to D. L. Jagers of 802 acres; thence west, with said Jagers' north line, to a tract of land sold to C. B. McCardell; thence in a northerly course, with said C. B. McCardell's east line, to a certain point in said line by running in a parallel line with the said first line to the Trinity river, so as to make 684 acres of land; thence down said Trinity river with its meanderings to the place of beginning, to contain 684 acres of land out of leagues No. 6 and 9, granted to Jose Dolores Martinez, in the county of Liberty and state of Texas, together with all and singular the rights, members, and appurtenances to the same belonging or in anywise incident or appertaining, after advertising said land according to law and at public auction at the door of the courthouse in said county, within the hours prescribed by law on the first Tuesday in ———, A. D. 1875, sell said land to Mrs. Annie E. Searcy for the sum of sixty-eight and $40/100$ dollars ($68.00 and 40 cents), she being the highest and best bidder for the same, and, said sale being duly returned, was received and confirmed by said probate court at the November term, A. D., as appears from the minutes of said court, recorded in Minute Book A, page 644, and an order thereon passed, directing me, as administrator, to make conveyance to the purchaser of said land: Now, therefore," etc.

The said Annie E. Searcy tract is now known as the Arch McDonald tract of 684¾ acres, and is so marked on the Mansfield map, which is attached to statement of facts as Exhibit 12. And the said 684 acres which was sold and deeded by the administrator to James Davis, as above shown, was thereafter sold by said James Davis to John H. Harford, the description of the tract being given in the said deed from Davis to Harford as follows:

"Beginning at the S. W. corner of a survey of 320 acres off of league No. 6 of said 11-league grant, belonging to Reason Green; thence W., with the south line of said league No. 6, to the S. W. corner of a survey made for G. Byrd of 684 acres of said league; thence N., with the said Byrd's west line, to H. Johnson's; thence with the said Johnson E. line, to the S. W. line of a survey made for D. D. Moore; thence in a S. E. course to the S. W. corner of another survey made for D. D. Moore, and being the S. E. corner of the first-named D. D. Moore survey; thence from the said S. W. corner to the N. W. line of the first-named survey for Reason Green; thence, with the said Green's survey, to the place of beginning, so as to contain 684 acres, more or less."

And the location and description of the Reason Green tract referred to in the above description was shown by the deed from Gen. James Davis to Reason Green, dated September 19, 1850, conveying a tract of 320 acres out of league No. 6 of the Martinez grant, described as follows:

"Beginning at a stake on the south boundary line of said league from which a white oak 20 in. in dia. mkd. X brs. N., 63 deg. E., dis. $45/10$ and a white oak 14 in. dia. mkd. X brs. S., 4 deg. E., dis. $45/10$ vrs.; thence N., 1 deg. W., 950 vrs., to a stake from which a pine 12 in. dia. mkd. X brs. S., 20 deg. W., dis. $32/10$ vrs., and a sweet gum 12 in. dia. mkd. X brs. N., 75 deg. E., dis. 4 vrs.; thence N., 89 deg. E., 1,900 vrs. to a stake from which a red oak 22 in. dia. mkd. X brs. S., 84 deg. W., dis. $45/10$ vrs., and a red oak 18 in. dia. mkd. X brs. N., 42 deg. W., $45/10$ vrs.; thence S., 1 deg. E., 950 vrs. to the south boundary line of said league, a stake from which a sweet gum 18 in. dia. mkd. X brs. S., 57 deg. E., $45/10$ vrs., and a pin oak 12 in. dia. mkd. X brs. N., 30 deg. W., 2 vrs.; thence S., 89 deg. W., with the south boundary line of said league 1,900 vrs. to the beginning corner, containing 320 acres."

And there is no dispute about the actual location of this Reason Green 320-acre tract upon the ground; its position is well known and generally recognized.

The location of the D. L. Jagers 802-acre tract called for in the above-mentioned deed from the administrator to A. E. Searcy is shown by the deed to said Jagers from J. H. McCardell, administrator of said estate, dated January 1, 1874, and in part reading as follows:

"Know all men by these presents that James H. McCardell, the duly appointed and legally qualified administrator of the estate of James Davis, deceased, resident of the county of Polk, in said state, by virtue of an order of the probate court in and for the county of San Jacinto, ordering me, as administrator aforesaid, entered upon the minutes of said court at the July term, A. D. 1873, to sell, among other lands, the following described tract: Beginning at the S. E. corner of a league of land granted to J. D. Martinez, being league No. 6, on the west bank of the River Trinity, in Liberty county; then west, with the south line of said league, to a survey made from said league to Mrs. M. D. McCardell; thence N., with Mrs. M. D. McCardell's west line, to C. B. McCardell's south line; thence with said south line and her S. western line; thence east to Trinity river, so as to make 802 acres of land; thence down said river to the place of beginning; together with all and singular the rights, members, and appurtenances to the same belonging or in any wise incident or appertaining, after advertising the said land according to law, did, at public auction at the door of courthouse in said county, within the legal hours on the first Tuesday in September, A. D. 1873, did sell said land to D. L. Jagers for the sum of $802.00, he being the highest and best bidder for the same, and said sale, on being duly returned, was received and confirmed by the said court at the November term, A. D. 1873, as appears from the minutes of said court recorded in Min. Book A, p. 284, and an order thereon passed directing me, as administrator, to make a conveyance to the purchaser of said land."

And said Jagers afterwards sold this same tract of land to Robert L. Mulford, by deed dated December 13, 1875, and the Mansfield map (Exhibit 12 to statement of facts) has this tract marked thereon as "Chas. L. Mulford 802 acres." And the location and description of other tracts of land which are referred to in the testimony of J. V. Lea as bounding the tract of land sold to him by the administrator on October 5, 1875, are shown by other deeds offered in evidence, as follows:

A deed from the heirs of Gen. James Davis to C. B. McCardell, dated March 31, 1859, and reading in part as follows:

"Know all men by these presents that we, the heirs and children of Gen. Geo. J. Davis, late of the county of Polk, knowing it to have been the intention of our father to make our sister, C. B. McCardell, a title deed to the following described tract of land, and knowing he requested on his deathbed to have the field notes read to him in order to enable him to make the deed, and further believing it to be her equitable right in the distribution of our father's estate, do hereby each of us for ourselves make unto our sister, C. B. McCardell, a deed to the following tract of land, it being the same designed to be so deeded by our father: Lying in the county of Liberty, situated on one of the leagues granted to Jose Dolores Martinez, and including in the following boundaries: Beginning on the east boundary line of a survey made from off said leagues for James Davis, Jun., a stake from which a holly 12 in. dia. mkd. X brs.

north, 63 E., 4.6 vrs., and a live oak 12 in. diam. mkd. X brs. S., 4 west, 3⁸/₁₀ vrs.; thence east 2,700 vrs. to a stake from which a frame white oak 14 in. in dia. mkd. J. A. M. brs. N., 48 deg. E., 1⁸/₁₀ vrs., and an ash 13 in. in dia. mkd. X brs. S., 73 deg. W., 16 vrs.; thence south 220 vrs. to the west bank of a creek a stake from which a Spanish oak 18 inches mkd. XX brs. N., 23 deg., 4⁴/₁₀ vrs.; thence down said creek, with its meanderings, and in a direct line south, 39½ west, 2,200 vrs. to a stake on the west bank of said creek; thence west 1,210 vrs. to a stake from which a swamp white oak 18 in. in dia. mkd. X brs. N., 4 deg. W., 2 vrs., and a sweet gum 18 in. in dia. mkd. X brs. N., 14 deg. W., 4 vrs.; thence N., 12 deg. W., at 653 vrs. intersects the southeast corner of James Davis survey at 2,000 vrs., the place of beginning, containing 640 acres of land, more or less, to be hers to have and to hold forever."

A deed from the heirs of Gen. James Davis to M. S. McCardell, dated March 31, 1859, and reading in part as follows:

"Know all men by these presents that we, the heirs and children of Gen. James Davis, deceased, late of the state and county above written, knowing it to be the intention of our father to make to our sister, M. J. McCardell, a deed to the following described land, and knowing it to be her equitable right prior to a distribution of his estate between his heirs, do hereby each of us for ourselves make unto our said sister a deed to the following described tract of land: Lying in the county of Liberty, on the west bank of Trinity river, and situate on one of leagues granted to Jose Dolores Martinez; beg. at the S. E. corner of James Davis survey; thence S., 78 deg. W., with the said Davis S. line at 1,600 vrs., the said Davis southwest corner at 1,900 vrs., made corner, at stake from which a red oak 10 in. in dia. mkd. X brs. S., 20 deg. W., 2⁵/₁₀ vrs., and a white oak 12 in. in dia. mkd. X brs. N., 25 deg. W., 10 vrs.; thence S., 12 deg. E., at 810 vrs. intersects the N. line of a 320-acre survey made for Reason Green, made corner, a stake from which a pin oak 10 in. dia. mkd. X brs. N., 27 deg. E., 2⁶/₁₀ vrs., and a pin oak 16 in. in dia. mkd. X brs. N., 87 deg. W., 4⁴/₁₀ vrs.; thence east with said Green survey 1,080 vrs. to the said Green's northeast corner; thence south with said Green survey 1,344 vrs. to the southeast corner of the same; thence east with the south line of said league No. 6 to corner, made corner, a stake from which a sweet gum 16 in. in dia. mkd. X brs. S. E. 7 vrs., a chestnut white oak 8 in. dia. mkd. X brs. S., 16 deg. E., 5⁸/₁₀ vrs.; thence north 1,939 vrs. to the south line of T. A. McCardell survey, made corner, a stake which a sweet gum 16 in. in dia. mkd. X brs. S. E. 7 vrs., a chestnut white oak 8 in. dia. mkd. X brs. S., 16 deg. E., 5⁸/₁₀ vrs.; thence west with T. A. McCardell survey to his southwest corner a stake from which a swamp white oak 18 in. in dia. mkd. X brs. N., 4 deg. W. 2 vrs., and a sweet gum 18 in. in dia. mkd. X brs. N., 14 deg. W., 84 vrs.; thence north, 12 deg. W., with T. A. McCardell survey 653 vrs. to the place of beginning, to be hers to have and hold forever."

A deed from James Davis and wife to Fanny Culmore, dated April 2, 1875, and reading in part as follows:

"Know all men by these presents that we, James Davis and Sarah A. Davis, in consideration of the sum of $2,500 gold to us paid by Fanny Culmore, the receipt of which is hereby acknowledged, have granted, bargained, sold, and released, and by these presents do grant, bargain, sell, and release, unto the said Fanny Culmore all our right, title, and interest in and to the following described property (it being our

homestead), lying and being situated in the county of Liberty, state of Texas, to wit, 640 acres of land on the west side of Trinity river, being a portion of one of the 11 leagues granted to Jose Dolores Martinez by the state of Texas, and bounded as follows: Beginning at a stake from which a black walnut 14 inches in diam. ld. 14 X bears S., 85 deg. and 30 min. west, 6⁵/₁₀ vrs., and a red oak 22 inches in diam. mkd. X bears south, 47 deg. 30 min. east, 4 vrs.; thence S., 11 deg. east, 2,260 vrs. to a stake from which a swamp white oak 20 inches in diam. marked X bears N., 7 deg. W., 10 vrs., a swamp white 12 inches in diam. marked X brs. south, 67 deg. 30 min. east, 9¾ vrs.; thence S., 79 deg. W., 1,600 vrs. to a stake from which a black gum 12 in. in dia. mkd. X bears south, 59 deg. east, 8⁵/₁₀ vrs., and a white oak 20 in. diam. mkd. X bears N., 27 deg. west, 9 vrs.; thence N., 11 deg. west, 2,260 vrs. to a stake from which a white oak 20 in. in diam. mkd. X bears south, 28 deg. west, 7⁵/₁₀ vrs., and a white oak 16 inch. in diam. mkd. X bears south, 1 deg. east, 10 vrs.; thence N., 79 deg. east, 1,600 vrs. to the place of beginning."

The grantor, James Davis, in the deed just above copied, was a son of Gen. James Davis; and while there is no record from Gen. James Davis conveying to his said son, James Davis, the tract of land conveyed by that son to Fanny Culmore, as shown by the above deed, it was shown that this son, James Davis, claimed said tract of land under a deed from his father, Gen. James Davis, and this tract was recognized as the property and homestead of the son, James Davis, whose name was James K. Davis, and who was sometimes called James Davis, Jr.

A deed from J. H. McCardell, as administrator, to Mary Jane Henderson et al., dated January 28, 1881, and in part reading as follows:

"Know all men by these presents that I, James H. McCardell, of the county of Polk, state of Texas, the duly appointed and legally qualified administrator of the estate of James Davis, deceased, by virtue of an order of court issued at the March term, A. D. 1873, which said order is here referred to in Book A minutes of said court, p. 225, and said order was rendered at the July term of said court, p. 262, Minute Book A of said court, which here reference to said order commanding me to sell, among other lands belonging to said estate, the following described tract or parcel of land lying and being situated in the county of Liberty, state of Texas, and a part of (or 300 acres of league No. 9, of an 11-league granted to J. D. Martinez, to be surveyed on the N. line of said league, and being what is known as the Lake creek, known as the 'Lake Creek Plantation'), and the same mentioned in the will of testator devised to his widow for her natural life, together with all and singular the rights, members, and appurtenances to the same belonging or in any wise incident or appertaining, after advertising the said land according to law, did at public auction at the door of the courthouse in said county, within the hours prescribed by law, on the first Tuesday in Sept., A. D. 1873, did sell said land to Robt. Elgin for Annie Searcy, Lillian Elgin, only child of P. Elgin, deceased, and Alice Henderson, descendants of legatees, Mrs. Mary Jane Henderson for the sum of $1,200, they being the highest and best bidders for the same, and sale, on being duly returned, was received and confirmed by said probate court at the Nov. term, 1873, there which said order is here referred to in Book A minutes of said court, p. 284, directing me, as the administrator aforesaid,

to make conveyance to the purchaser of said lands: Now, therefore," etc.

And a deed from J. H. McCardell, administrator, to T. A. McCardell and C. D. Creath, dated November 27, 1861, and reading in part as follows:

"Know all men by these presents that I, James H. McCardell, administrator with the will annexed of James Davis, deceased, by virtue of an order of the county court of Polk county, made and entered of record at its May term, A. D. 1860, authorizing and requiring me to sell at public outcry before the courthouse door in the town of Livingston, in said Polk county, after giving notice of said sale, the following described tract or parcel of land belonging to said decedents' estate, lying and being situate in the county of Liberty and state aforesaid, and more fully described as follows, to wit: A part of the headright leagues of J. D. Martinez embraced in said grant to 11 leagues to said Martinez, on the west side of the Trinity river, between the river and Lake Creek plantation, a part of the two Martinez leagues there located; beginning at the upper corner of the upper league on the west bank of the river, running with said league line until it strikes Lake Creek plantation; thence with said plantation line to the same corner of said plantation line; thence with Lake creek west; thence along Lake creek so as to include in a body 962¾ acres going back and commencing on the river; and whereas, after giving the notice required by the statutes in such cases, I did on the first Tuesday in February, A. D. 1861, at the place required by the order, and in the manner and form required by the statutes, and on the terms of sale as specified in said order, offer said described land for sale to the highest bidder, at which said sale T. A. McCardell and C. D. Creath, being the highest and best bidder thereof at the sum of $1,300.00, or $1.35 per acre for said tract, the same was struck off to them. And said sale having been duly reported to the county court aforesaid, and the same being inquired into by said court at its February term, A. D. 1861, it was in all things allowed and confirmed, and I was ordered to extend the title to said land."

C. D. Creath, one of the grantees in the above-mentioned deed, was the mother of the appellee J. V. Lea, and the other grantee in said deed, T. A. McCardell, after said deed was made to them, conveyed all his interest in said land to the said Mrs. Catharine D. Creath, his deed to her not being dated, but acknowledged July 11, 1863, and in part reads as follows:

"Know all men by these presents that I, T. A. McCardell, having this day bargained and sold and conveyed to Catharine D. Creath, her heirs and assigns, for the sum of $397.00 good and lawful money in hand paid in consideration for my entire interest and claim in the following described tract or parcel of land purchased in the year 1861 of the estate of James Davis, deceased, the said land having been sold in the town of Livingston, Polk county, by order of court, and deeded to T. A. McCardell and Catharine D. Creath, jointly by J. H. McCardell, administrator of the estate of James Davis, deceased, the said land lying and being in the county of Liberty and state aforesaid, being more fully described as follows, to wit: A part of the headright league of J. D. Martin's embraced in said grant of 11 leagues to said Martinez, situated on the west side of Trinity river, between the river and Lake Creek plantation, a part of the two Martinez leagues there located; beginning at the upper corner of the upper league on the west bank of the river, running with said league line until it strikes Lake Creek plantation;

thence with said plantation line to the lower corner of said plantation line; thence with Lake creek west; thence along said Lake creek so as to include in a body 962¾ acres going back and commencing on the river."

The said Mrs. Catharine D. Creath afterwards conveyed this same land to Mary Lea Hume, by deed dated September 2, 1881, and on the Mansfield map, which is Exhibit 12 to statement of fact, this tract is marked as "H. Chas. Hume 962⁵/₁₀ acres."

Another deed was offered in evidence which calls for the said James Davis tract, which was sold by James Davis and wife to Fanny Culmore, as above noted, this deed being from J. H. McCardell, administrator, to William Williams, dated January 4, 1861, and in part reading as follows:

"Know all men by these presents that I, James H. McCardell, administrator with the will annexed of James Davis, deceased, by virtue of an order of the county court of said county made at its October term, 1860, authorizing and requiring me to sell the lands hereinafter described at public auction at the courthouse door of said county after giving the notice required by law in such cases, did on the first Tuesday in December, A. D. 1860, after due and legal notice, expose the hereinafter described land for sale according to the requirements of said order, when William Williams, being the highest and best bidder for said land hereinafter described, at the sum of $362.25, the same was knocked off to him, and the said sum having been secured as the law required, and said sale having been by me duly reported to the said county court, and said court at its December term, A. D. 1860, having confirmed and approved said sale, and by said order authorized and required me as administrator as aforesaid to execute and deliver to the said William Williams title for said lands: Now, know all men that by virtue of the order aforesaid and the consideration of the sum of $362.25, the amount of the said bid secured to me to be paid by note and good securities, have bargained, sold, and conveyed, and by these presents do bargain, sell, and convey, to the said William Williams the following described tract of land, situated in Liberty county, said state, west of the Trinity river, being a part of one of the eleven leagues of land granted to J. D. Martinez; beginning on northern line of league at the N. E. corner of tract No. 2, sold at same time to D. D. Moore, 70 English chains from N. W. corner of league from which a W. oak 6 in. dia. mkd. X brs. N., 41½ E., 22 links, and a red oak 16 in. in dia. mkd. X brs. S., 31 E., 30 links; thence S., 1 W., with eastern line of said tract No. 2, to its S. E. corner (in edge of pondy prairie), from which R. oak 12 in. dia. mkd. X brs. N., 71½ W., 34 links, and B. gum 14 in. dia. mkd. X brs. S., 8 W., 82 links; thence N., 89 E., to western boundary line of survey on said league known as the James Davis 640-acre survey; thence in a northerly direction with west line of said James Davis survey and west line of tract No. 1, sold at same time to said D. D. Moore, and conveyed to him (as also was tract No. 2, January 4th, A. D. 1861), to the north boundary line of said league; thence with said boundary line S., 8 W., to beginning corner, containing 345 acres."

Also a deed was offered from said administrator which calls for the G. B. Byrd tract, this deed being to Henry Johnson, dated April 4, 1876, and in part reading as follows:

"Know all men by these presents that I, James H. McCardell, the duly appointed and legally qualified administrator of the estate of James Davis, deceased, resident of Polk county, in said state, by virtue of an order of the probate court in and for the county of San Jacinto, naming me as administrator aforesaid at the July, A. D. 1873, term of said probate court, as appears from the minutes of said court, to sell among other lands the following described tracts or parcels of land, being part of league No. 6 of an 11-league grant to J. D. Martinez, in Liberty county, in said state: Beginning at the most southwest corner of a survey of land made for D. D. Moore where said D. D. Moore's survey crosses the north line of said league No. 6; thence west with said league line to the N. E. corner of survey made from —— of said league for G. B. Byrd; then to run south with said Byrd, east with said Byrd; thence north to the place of beginning, so as to contain 40 acres of land in as nearly a square a form as practicable; together with all and singular the rights, members, and appurtenances to the same belonging or in any wise incident or appertaining, after advertising the said land according to law, and at public auction at the door of the courthouse, within legal hours of sale, on the first Tuesday in September, A. D. 1873, did sell said land to Henry Johnson for the sum of $35.00, he being the highest and best bidder for the same, and, said sale being duly returned, was received and so confirmed by the said court at the November term, A. D. 1873, as appears from the minutes of said court recorded in Min. Book A, p. 284, as an order passed thereon directing me as administrator to make conveyance to the purchaser of said land. * * * "

And showing that the customary course or practice pursued by J. H. McCardell, administrator of the estate of Gen. James Davis, in selling lands, was to have only an indefinite and meager description in his applications for sale, the orders of sale, his reports of sales, and the orders of confirmation, and then to more definitely describe the land in the deed which he would make under such orders and reports, the appellees offered in evidence other applications for sale, orders of sale, and reports of sale obtained and made by said administrator, and orders of confirmation for lands sold by him at other times than on October 5, 1875, as follows:

An order confirming certain sales theretofore reported, and reading as follows:

"The Estate of James Davis, Dec'd, by J. H. McCardell, Adm'r.

"In the matter of this estate, the said administrator having returned into court an account of the sale of certain lands realty belonging to said estate heretofore ordered to be sold, on the first Tuesday in September last, from which it appears that the following lands was sold to the following named purchaser, to wit: First, 802 acres of land situated in Liberty county, Texas, part of league No. 6 of the J. D. Martinez eleven-league grant, sold to D. L. Jagers; second, 300 acres of land situated in Liberty county, Texas, part of league No. 9 of the J. D. Martinez eleven-league grant, sold to Robert Elgin, for Annie Searcy, Lillian Elgin (only child of P. Elgin), and Alice Henderson; third, 960 acres of land situated in Parker county, Texas, patented to heirs of Thos. Neblett, sold to Tom Moore, J. V. Lea, B. McCardell, and J. A. McCardell; fourth, 40 acres of land situated in Liberty county, Texas, part of league No. 6 of J. D. Martinez eleven-league grant, sold to H. Johnson; fifth, 4,428 acres of land situated in Chambers county, Texas, the same being league No. 11 of the J. D. Martinez eleven-league grant, sold to Tom Moore, J. V. Lea,

and G. W. Davis; sixth, 1,107 acres of land situated near the line of Harris and Montgomery county, Texas, part of the Pressly Gill headright league, sold to James Davis; seventh, 1,-107 acres of land situated in Montgomery county, Texas, part of the Clark Beach headright league, sold to James Davis; and the same having been duly considered by the court, and the manner of said sale so made having been inquired into because it appears to the court that sale has been fairly made and in conformity of law, it is therefore ordered that the same be, and the same is hereby, approved and confirmed. * * * "

A report of sale filed by said administrator on January 1, 1861, reading:

To the Honorable the County Court of Polk County:

The undersigned administrator of the estate of James Davis respectfully submits the following account of sales of real estate lying in the county of Liberty made by him on the first Tuesday in December, 1860 (the 4th inst.), before the courthouse door in the town of Livingston, Polk county, on a credit of twelve months, with ten per cent. per annum interest from date until paid, said sale made in pursuance of your honorable court, to wit: 1,579 acres (fifteen hundred and seventy-nine acres), a part of the J. D. Martinez eleven leagues, sold to D. D. Moore for the sum of.....................$1,761.64

345 acres (three hundred and forty-five acres) sold to W. Williams sons for the sum of...................... 362.25

────────

$2,123.89

An order of sale dated June 1, 1860, in part reading as follows:

"To J. M. Crosson, chief justice of Polk county, Texas, the petition of James H. McCardell, administrator of the estate of James Davis, deceased, respectfully shows that the said estate is considerably in debt, and that it will be necessary to sell other property belonging to said estate to pay the debts, your petitioner represents that the debts already accepted to amount to ten thousand one hundred $07/100$ dollars ($10,100.07), the amended list of claims this day presented amounts to two hundred and eighteen $30/100$ dollars, and there are other claims amounting to about one hundred and ninety-six $15/100$ dollars, the sum of thirteen hundred dollars, set apart to T. A. McCardell and wife, in lieu of one unsound negro set apart to them, on distribution of negroes, and which has since died, amounting in the whole to eleven thousand eight hundred and fourteen $52/100$ dollars ($11,814.52) dollars, and to this is also to be added expenses of administrators and cost of court that may yet accrue. Assets on hand amounting to twenty-six hundred and fifty-two $6/100$ ($2,652.06) on his settlement this day, and also three hundred and fifty-six $66/100$ dollars sales of perishable property due the 1st of August, 1860, and sales of real estate, to wit, part of J. C. Swilley league, amounting, to two thousand and ninety-two $68/100$ dollars ($2,092.68), due on or about April the 1st, 1861, amounting in all to five thousand one hundred and one and $40/100$ dollars, showing a balance yet due of six thousand seven hundred and thirteen $12/100$ dollars (6,-713.12), to which add at least one thousand dollars (1,000) for interest and administration costs and court fees, making an amount equal to (7,-713.12) dollars, wherefore your petitioner prays your honorable court to grant him an order for the sale of the league of land lying in Liberty county, Texas, known as the White Oak league, known also as a part of Jose Dolores Martinez league grant of land. Your petitioner further prays for an order of sale of the lands lying between the plantation known as Lake Creek plantation and the Trinity river, in Liberty county, Texas, beginning at the S. E. corner of survey made of the Martinez eleven league for F. A. & C. B. McCardell, and sufficient quality to pay said debt, and also that the said White Oak league, or so much thereof as may be necessary to pay said debts, and in such quantities as may be deemed best, advantageous to said estate, by said administrator and in duty bound he will ever pray," etc.

"J. H. McCardell, Administrator."

Report of sale filed January 1, 1861, reading as follows:

"The undersigned administrator of the estate of James Davis respectfully submits a/c of sales of real estate lying in the county of Liberty made by him on the third Monday in December, 1860 (the 4th inst.), before the courthouse door in the town of Livingston, Polk county, on a credit of twelve months, with ten per cent. per annum interest from date until paid, said sale made in pursuance of your Hon. court, to wit: 1579 acres (fifteen hundred and seventy-nine acres), a part of the one of the J. D. Martinez 11 leagues sold to D. D. Moore, for the sum of......$1,761.64

345 acres (three hundred and forty-five acres) sold to Wm. Williams, Senr., for the sum of............ 362.25

────────

$2,123.89"

Order confirming sale made in December, 1860, reading as follows:

"Succession of James Davis.
"December Term, A. D. 1860.

"James H. McCardell, administrator of the estate, having at this term of this court filed a report of the sale of fifteen hundred and seventy-nine acres of land, a part of the headright of J. D. Martinez, on the first Tuesday in December, 1860, sold to D. D. Moore, and also three hundred and forty-five acres, part of the same survey, sold to W. Williams, sold on the same day, both of said sales being made at public outcry, in the manner required by law, and in said sales the court being satisfied that said administrator has proceeded in strict conformity to law and the decree of this court. It is therefore ordered by the court that said report be received, and in all things allowed and confirmed and recorded, and said administrator is hereby authorized to extend titles to said purchasers, according to the statute in such cases made and provided."

And under that order of confirmation the administrator on January 4, 1861, made a deed to William Williams for 345 acres of land described by complete and definite field notes, this deed reciting that it was made—

"by virtue of an order of the county court of said county made at its October term, 1860, authorizing and requiring me to sell the lands hereinafter described at public auction at the courthouse door of said county, after giving the notice required by law in such cases, did on the first Tuesday in December, A. D. 1860, after due and legal notice, expose the hereinafter described land for sale according to the requirements of said order, when William Williams, being the highest and best bidder for said land hereinafter described, at the sum of $362.25, the same was knocked off to him, and the said sum having been secured as the law required, and said sale having been by me duly reported to the said county court, and said court at its December term, A. D. 1860, having confirmed and approved said sale, and by said order authorized and required me, as administrator as aforesaid, to execute and deliver to the said William Williams title for said lands."

Then follows the granting clause for a tract out of the Martinez grants west of Trinity river, described by definite and complete field notes of a tract of land "conveying 345 acres."

An order of sale made in October, 1860, reading as follows:

"In the matter of this succession James Davis, H. McCardell, the administrator of this estate, filed an additional exhibit, showing more clearly the indebtedness of said estate, as well as the moneys coming to said estate, also his petition praying the allowance and confirmation of said exhibit and the sale of more property of this estate, which petition is in all things granted, and said exhibit ordered to be filed and recorded; and whereas, it appearing to the satisfaction of the court that there is $3,334\frac{15}{100} against the estate that is not provided for, or any funds coming in the hands of administrator to pay it; and whereas, it also appearing to the satisfaction of the court that lands ordered to be sold at the May term of this court lying on Lake creek has not been sold; it is therefore ordered, adjudged, and decreed by the court that J. H. McCardell, the administrator, sell at the courthouse door of the town of Livingston, on the 1st Tuesday in December next, so much land off of the two leagues of the J. D. Martinez 11-league grant, upon which Lake Creek plantation is situated, as will pay the aforesaid sum of three thousand and three hundred and thirty-four $\frac{15}{100}$, and other and further costs in this matter incurred, said land to be directed and sold in such sized tracts or parcels as may appear to the administrator to be most advantageous to the estate to be sold, on twelve months' credit, taking notes and approved security, with ten per cent. interest from date of sale till paid."

The land east of the Trinity river, which was bought by J. V. Lea at the administrator's sale made on October 5, 1875, is located in the Martinez league No. 1, which is east of the Trinity river, as shown by the administration proceedings as well as by the deed made to Lea by the administrator on April 5, 1876, that deed reading as follows:

"That I, James H. McCardell, the duly appointed and legally qualified administrator with the will annexed of the estate of James Davis, deceased, and resident of said county, by virtue of an order of the Hon. district court of San Jacinto county in said state, setting as a court of probate, made and entered upon the minutes of said court at the July term, 1875, thereof, ordering and requiring me, as administrator as aforesaid, to sell the land hereinafter described (among other land) at public auction to the highest bidder at the courthouse door of said San Jacinto county, after giving the notice provided, did on the first Tuesday in October, 1875, expose said lands to sale according to the terms of said order, and James V. Lea, he being the highest and best bidder therefor, the same was struck off to him for the sum of two hundred and fourteen $\frac{20}{100}$ dollars. And said sale, having been duly returned to said court, was by said court received and confirmed at the November term, 1875, thereof as appears from the minutes of said court entered in Minutes Book A, page 464, and an order thereon was made directing me, as administrator as aforesaid, to make conveyance to the purchaser or purchasers of said land.

"Now, therefore, I, James H. McCardell, administrator as aforesaid, in consideration of the premises, the orders of said court, and the payment of said sum of two hundred and fourteen $\frac{50}{100}$ dollars to me in hand fully and finally paid by the said James V. Lea, have granted, bargained, sold, released, and conveyed, and by these presents do grant, bargain, release, and convey, unto the said James V. Lea the following described tract of land, to wit:

"Division No. 7 and 8 of block No. 4, division No. 9 and 10 of block No. 5, division No. 11 and 12 of block No. 6, division No. 13 and 14 of block No. 7, as per plat filed in office of the county court of Polk, and transferred to the office of the district court of said San Jacinto county in case of estate of James Davis, deceased, said lands more fully described as follows:

"Beginning at the N. W. corner of division No. 7, in block No. 4; thence east at sixty English chains, corner of league line between division No. 7 and 9; thence east again at sixty English chains, corner in said line between division No. 9 and 11; thence again east at sixty English chains, corner on said line between division No. 11 and 13; thence again east twenty-six English chains and fifty links, to N. E. corner of division No. 13, it being the northeast corner of the league hereinafter mentioned, making the distance from the beginning to said northeast corner two hundred and six English chains and fifty links; thence in a southern direction one hundred and one English chains, to corner of division No. 4, it being the southeast corner of said league; thence west at twenty-six English chains and fifty links, corner (on south league line) between division No. 14 and 12; thence again west on said line sixty English chains, corner between division No. 12 and 10; again west on said line at sixty English chains, corner between division 10 and 8; again west sixty English chains on said line, to corner between division No. 8 and 6, making the length of the line two hundred and six English chains and fifty links; thence north with east line of block No. 3 to the place of beginning, containing two thousand and one hundred and forty-five acres more or less; the said lands lying in Liberty county, said state, east of the Trinity river, and being a part of one of the eleven leagues granted to J. D. Martinez, known as the White Oak league."

Then all of that land which Lea purchased at said administrator's sale *east* of the Trinity river out of said league No. 1 he afterwards sold to his aunt, Mrs. J. H. McCardell (who was also known as M. S. McCardell), and Mrs. Cornelia J. Henry, one-half of all of said land to each of them, as shown by his deeds to them, respectively; the deed from Lea to Mrs. M. S. McCardell being dated June 27, 1882, and reads as follows:

"Know all men by these presents that I, James V. Lea, of the county of San Jacinto and state of Texas, in consideration of the sum of $250.00 to me in hand paid by M. S. McCardell of the county of Polk and state of Texas, have granted, sold, and quitclaimed unto the said M. S. McCardell an undivided one-half interest in and to that certain tract or parcel of land lying and situated in Liberty county and state of Texas, and more particularly described as follows, to wit: A part of the J. D. Martinez grant known as White Oak league on east side of Trinity river; beginning on league line at survey of 318 acres made to T. A. McCardell; thence east with said line to eastern corner of said league line; thence south with eastern boundary line to southeast corner of league line; thence W. with said line to survey made for Simeon De Blanc; thence N. with De Blanc and McCardell's line to northern league line, containing 2,100 acres; to have and to hold the above-described premises in fee simple, together with all the rights and appurtenances thereto belonging, unto the said M. S. McCardell, her heirs and assigns, forever."

And the deed from Lea to Mrs. Cornelia J. Henry, being dated December 29, 1877, reads as follows:

"Know all men by these presents, that I, James V. Lea, of said county and state, for and in consideration of the sum of five hundred dollars to me in hand this day paid by Mrs. Cornelia J. Henry of the county of Smith in said state, have this day and by these presents do bargain, sell, and convey unto the said Cornelia J. Henry the following described tracts of land: First, that certain two hundred acres of land part of the three hundred and twenty acre headright survey of Robert W. S. Boothe lying in San Jacinto county, and more particularly described in a deed from Jack Davis to Eliza Davis, dated 8th June, 1863, and recorded on page 386 of Book B, records of deeds of San Jacinto county, and conveyed to me by J. H. McCardell as administrator of said Eliza Davis. Second, ten hundred and seventy-two and one-half (1,072½) acres of land lying on the east of the Trinity river, in the county of Liberty, in said state, the same being the one-half of the land conveyed to me by James H. McCardell as administrator of the estate of James Davis, deceased, by deed dated the 5th day of April, A. D. 1876, as divisions No. 9 and 10 of block No. 5, divisions No. 11 and 12 of block No. 6, divisions No. 13 and 14 of block No. 7, as per plat filed in the office of the county clerk of Polk county, and transferred thence to the office of the district court of San Jacinto county in this case of the estate of James Davis, and being a part of one of the eleven leagues granted to J. D. Martinez, known as the 'White Oak League,' said land (the one-half interest in which now remaining in me) is fully described in said deed from said McCardell to me. * * * "

It was H. P. Mansfield, one of the appellants, who first claimed to have discovered that there remained land in leagues Nos. 9 and 6 of the Martinez grant which the administrator of the Gen. James Davis estate did not sell, and Mansfield it was who gave to the heirs of Gen. James Davis the first information about this supposed unsold land. In his own words Mansfield's testimony is:

"The powers of attorney from the heirs of Gen. James Davis to H. P. Mansfield were executed to me under the following circumstances: I first discussed it with Mr. C. B. Martin and Judge Lea. I had an abstract prepared which furnished the first information about the leagues. Messrs. Martin and Lea fully discussed the matter and we gained such information as the abstract disclosed. I sketched in the different tracts on a map which I was preparing. I knew very well that there was something there to be recovered. For this reason, we then entered into the agreement as set out in the power of attorney."

Further, Mansfield testified:

"I had figured that there was vacant land there, and I think the McCardells always knew that there was vacant land between the Lake Creek plantation and the C. B. McCardell."

And the power of attorney which the heirs of Gen. James Davis (including J. V. Lea) gave to Mansfield on June 4, 1902, expressly and particularly stated that this power of attorney did not apply to the various tracts of land in the Martinez grant which some of said heirs owned in their own right and individually, not by inheritance alone, but also by deeds of gift and deeds made by order or decree of court. Those lands so individually

owned are plainly protected by being excluded from the power of attorney by this provision thereunder, reading:

"Provided, however, that some of the surviving heirs and descendants above named of the said James Davis, Sr., claim to own in their own right and individual name other than inheritance tracts of land in one or both of said leagues, which tract or tracts have been conveyed to them by gift or otherwise, or by some order or decree of court or by deed. Wherefore it is expressly agreed that any tract or tracts of land that have been heretofore conveyed to any of the heirs or descendants above named as their individual property are hereby excepted and not included in the land intended to be recovered under the terms of this contract and power of attorney, and are excepted from the conveyance made herein to our said attorney, but our said attorney agrees to do whatever may be necessary to put all said lands as to title, etc., in such shape as that they may be in condition to be good marketable titles."

And there was no testimony that any of the Davis heirs ever asserted claim to or exercised acts of ownership over any of the land which J. V. Lea was sued for in this suit until some time after the said power of attorney was obtained by Mansfield.

Dr. W. K. McCardell, one of the Davis heirs, testified that about 1902 he and his brother, Davis McCardell, made a trip to the vicinity of this land for the purpose of locating the C. B. McCardell tract, which they and others owned, and that at that date "that [C. B. McCardell tract] is all we thought we had." Also he testified regarding that trip that "the only thing I did was to locate this McCardell tract; that was the only thing I was interested about." And further he testified:

"At that time I claimed only an interest in the C. B. McCardell and the M. S. McCardell tracts; that was in 1902. I knew some of the land was unsold, but I did not know where it was. I did not pay any attention to it. The McCardells claimed they had an undivided estate; we had that ever since it was unsold. At that time I was only interested in marking out two certain tracts."

And Davis McCardell, another witness for appellants, testified:

"I have never heard Mr. Lea say that he did not own the land he has now sued for; never heard him say that he did or did not own it. The first I heard of it he was claiming the strip between Lake Creek plantation and the McCardell tract. When the power of attorney was made it provided in there that the different heirs were giving him the power of attorney to their undivided interest and not their individual ownership. We claimed the C. B. McCardell and M. S. McCardell tracts. Mr. Mansfield has not sued for this land. On this sketch that I have identified there was originally some 40-acre subdivision between the Lake Creek plantation and the C. B. McCardell. There is not supposed to be any 40-acre subdivision between the Creath and Hume, I am certain of that. My brother and I were together when we were locating the C. B. McCardell and the M. S. McCardell; that is all that we claimed at that time, and some one was disturbing the timber and we wanted to stop it."

And about the time the Davis heirs executed to Mansfield the power of attorney above mentioned a claim was being made by

the Davis heirs that there was some land in the west end of both leagues, Nos. 6 and 9 of the Martinez grant, which the administrator of Gen. James Davis had not sold. This claim involved a contention that there was an excess in said leagues on the western end of same, and there being involved in this claim a dispute about the location of the western boundary line of said two leagues, there being a conflict between certain surveys known as the "Shattuc Locations" and the western ends of the Martinez leagues Nos. 6 and 9. And on January 14, 1910, H. P. Mansfield, acting under said power of attorney, and joined by J. V. Lea and C. B. Martin, individually, executed a quitclaim deed to Jas. E. Ferguson for all of the land involved in said boundary dispute as well as for additional lands in said leagues Nos. 6 and 9, the land conveyed thereby being described as follows:

"The following lots, tracts, or parcels of land lying, situated, and being in the county of Liberty and state of Texas, and more particularly described as follows, to wit: Being parts of leagues Nos. six (6) and nine (9) of the Jose Dolores Martinez eleven (11) league grant, the title to which was issued by the government of Coahuila and Texas on the 28th day of November, 1833; beginning at the N. W. corner of said league No. 9; thence, in the southerly direction, 2,500 varas with the W. boundary line of said league No. 9 to the S. W. corner of same; thence, in a westerly direction, 1,363 varas with the north boundary line of said league No. 6 to the northwest corner of same; thence, in a southerly direction, 2,500 varas with the west boundary line of said league No. 6 to the S. W. corner of the same; thence, in an easterly direction, with the south boundary line of said league No. 6 to the southwest corner of a 320-acre tract out of said league No. 6 in the name of Reason Green; thence, in a northerly direction, with the west boundary line of said Reason Green 320-acre tract to the northwest corner of the same; thence, in an easterly direction, with the north boundary line of said Reason Green 320-acre tract to a point where the west boundary line of the M. H. McCardell tract of said league 6 intersects the said north boundary line of said Reason Green 320-acre tract; thence, in a northerly direction, with the west boundary line of the said M. S. McCardell tract to the 'N. W. corner of the same; thence, in a northeasterly direction, with the N. boundary line of the said M. C. McCardell tract to the S. W. corner of a tract of 640 acres of land out of the said leagues 6 and 9, known as the James K. Davis tract; thence with the west boundary line of the said James K. Davis 640-acre tract, in a northwesterly direction, to the .S. E. corner of a 345-acre tract out of said league No. 9, known as the William Williams tract; thence with the south boundary line of said William Williams 345-acre tract to the S. W. corner of the same; thence, in a northerly direction, with the west boundary line of said William Williams 345-acre tract to the N. W. corner of the same; thence, in a westerly direction, with the north boundary line of said league No. 9 to the place of beginning. Also a (190) one hundred and ninety acre tract of land out of said league No. 9 known as the D. B. Moore tract, described as follows: Beginning in the north boundary line of league No. 9 of the Martinez eleven-league grant at the N. E. corner of· a tract of land out of said league No. 9 known as the William Williams 345-acre tract; thence south with the east boundary line of the said William Williams 345-acre tract to the N. E. corner of a tract of land in the name of James K. Davis, 640 acres out of leagues six and nine, said Martinez grant; thence with the north boundary of said James K. Davis 640-acre tract, in a northeasterly direction, to the N. E. corner of the said James K. Davis 640-acre tract and the S. E. corner of this; thence, in a northerly direction, with the east boundary line of this tract and the west boundary line of the James K. Davis Lake Creek plantation tract of 300 acres to the north boundary line of said league No. 9 for the N. E. corner of this, which is also the N. W. corner of said Lake Creek plantation tract; thence, in a westerly direction, to the place of beginning; said 190-acre tract of land being heretofore claimed as a part of the estate of Tom Moore, non compos mentis, and fully described in the matter of said estate in Vol. 3, page 370, of the probate minutes of Liberty county, Texas, to which reference is here made for additional description. Said two (2) tracts containing in all, approximately, three thousand two hundred (3,200) acres of land. To have and to hold unto the said James E. Ferguson, his heirs and assigns, forever; and· we do hereby bind ourselves, our heirs, executors, and administrators, to forever warrant and defend the title unto the said premises unto the said James E. Ferguson against any and all persons claiming the same by, through, and under us and no further, it being our intention to only quitclaim unto the said James E. Ferguson all our interest in and to said land."

And further said quitclaim deed to Ferguson contains this recital:

"And whereas, part of said above-described tracts of land are now claimed by certain parties who claim to deraign title to a part of said land under and by virtue of what is known as the R. W. Shattuc locations, numbers 62, 63, and 64, which are fully described in Vol. 13, pages 540, 542, and 543 of the deed records of Liberty county, Texas, in a conveyance to Herman Brassler, reference being here made to said records for a more particular description of said land; and whereas, it is contemplated that it will take some time to clear the title to said Shattuc locations: Now, therefore, it is agreed that the said nonnegotiable note for two thousand five hundred ($2,500.00) dollars above mentioned and described, which is to be executed by the said James E. Ferguson, shall not become due and payable until the said James E. Ferguson or his associates shall successfully litigate and defend his title against said R. W. Shattuc locations above described."

And regarding that deed to Ferguson, the appellee, J. V. Lea, testified: ·

"As to what we were offered, and the purchasers take their own chance, for the tract off of the west end of the two leagues, I will give you all the information you want. My understanding and recollection is that $5,000 was the consideration to the Davis heirs; $2,500 was paid in cash. Whatever was coming to me I got. I declined for quite a while to have anything to do with it, but at your (Judge Stevens) instance and request I went up there and Davis McCardell came down here and signed it. I demanded and· received my interest ·in cash, some $250 or $300. I received $360 for my part of the check paid for the deed to Ferguson. The other heirs were insisting on making that trade, and Davis McCardell came to my office, as I don't think I discussed that with Keenan, and he insisted that it was land that we did not have an interest in, and I did not believe so, and Judge Stevens and I got to talking· about it, and he explained about where the land was; he was interested in it. I went into Mansfield's office. Judge Stevens was there when I signed it."

And Mansfield testified that he knew before that deed was made to Ferguson that the appellee J. V. Lea was claiming land involved in this suit. And further Mansfield testified:

"I say that Mr. Lea executed the deed to Mr. Ferguson, but required all of his part paid to him in cash, and would not take any interest in the note, and that I advanced the money that he might be paid off. When I bought his portion I considered that I had what he had acquired as an heir. That was his interest in the estate. Up to the time J. V. Lea signed the deed to Ferguson he had not been shown this map which indicates him as owning 686 acres, for this map had not been made at that time."

And the map referred to in Mansfield's testimony just above quoted is attached to the statement of facts as Exhibit 12, and he delineated thereon a supposed tract of 686.-88 acres, with the name "J. V. Lea" written in red pencil; but the location of such a tract for J. V. Lea is purely an arbitrary creation by Mansfield, his own testimony about the map being:

"According to my computation and ground work, and according to my map, I showed 2,100 $^{64}/_{100}$ acres unsold. There should be three tracts of 686$^{88}/_{100}$ acres each, and the H. Johnson 40-acre tract. I marked one of those tracts J. V. Lea for my information."

Also Mansfield testified:

"As to whether I think Mr. Lea could get his 686 acres out of what is left there, I said the vacant land was there and unsold at that date. I say that it is on the ground, unsold by the administrator. I would not like to take my chances of getting my 686 acres there."

Further, Mansfield testified that this map was not made alone from an actual survey, but that he—

"used some calls from the record and the abstract in preparing the map which exhibits the 686⅔ acres in three tracts. I never ran out all the sides of the survey. From the measurement I could not say, but from the records of deeds I could know that the survey balanced. I found that 2,100$^{64}/_{100}$ acres was unsold. According to my map, there would be 2,100 $^{64}/_{100}$ acres unsold. I told you that the James Davis called for the Byrd tract as much as it did for the Green. The James Davis deed calls for the Reason Green and it also calls for the Byrd. I placed it, as is shown on the map, as the most reasonable location. As I have placed it, it would be something over 1,300 varas from the Reason Green, but it would be against the Byrd tract as called for."

It already appears in this statement that the deed made by the administrator to James Davis located the tract he conveyed to James Davis as joining the Reason Green tract on the west, but as noted in the testimony of Mansfield, just above quoted, Mansfield placed said James Davis tract more than 1,300 varas distant from the Reason Green tract.

With reference to the second counter proposition, it will be well to say that on March 7, 1874, the administrator of the estate of James Davis filed a report seeking a final settlement of the estate, and in that report set out that the lands on hand undisposed of and subject to distribution among the heirs and distributees were lands in some six or

seven surveys on grants located in different counties, and in this list of lands on hand undisposed of were lands described in said report as follows:

2,145 acres, J. D. Martinez, east side of Trinity, in Liberty Co., "White Oak League."
2,739 acres, J. D. Martinez, west side of said river, in Liberty Co.

Afterwards, on July 9, 1875, the probate court made an order "for the partition of the lands belonging" to said James Davis estate, and a part of the lands mentioned in this decree were described as follows:

2,145 acres, J. D. Martinez, east side Trinity river, Liberty Co., "White Oak League."
2,739 acres, J. D. Martinez, west side of Trinity river, in Liberty Co.

Then on July 9, 1875, the four commissioners of partition, who were appointed by the order of court just above referred to, reported back that the several tracts of land which said order directed them to partition "are of such character and so situated that they believe no just division of them among the heirs or distributees of said estate can be made without diminishing the value of said lands, and that division thereof is inconvenient and impolitic." In this report, filed on July 9, 1875, among the several tracts of land listed as the land which said commissioners were directed to partition, are the same Martinez lands, again thus described:

2,145 acres, J. D. Martinez, east side Trinity river, Liberty Co., "White Oak League."
2,739 acres, J. D. Martinez, west side of Trinity river, in Liberty Co.

And on July 9, 1875, the probate court ordered that the report made by said four commissioners of partition "be received and is hereby approved and confirmed and directed to be filed and recorded."

And, further, on the same day, the court duly entered an order directing the administrator to sell, on the first Tuesday in October next, the very same list of lands set out in the above-mentioned report of the administrator for final settlement filed on March 7, 1874, in the order made on July 9, 1875, appointing commissioners to partition all the lands belonging to the estate, and in the report of said commissioners of partition, and the description in this order of sale being the same as in those other reports and orders, to wit:

2,145 acres, J. D. Martinez, east side Trinity river, Liberty Co., "White Oak League."
2,739 acres, J. D. Martinez, west side of Trinity river, in Liberty Co.

And then, on November 1, 1875, the administrator filed his report of sale showing that on the first Tuesday in October, 1875, the date being October 5th, he sold all the lands described in the several documents above referred to, and as described in said order of sale, this report of sale being in tabulated form, and setting out under separate heads a description of each tract sold, by lot number, the name of the original grantee, the purchaser's name, and the price paid,

and in this list the lands sold out of the Martinez grants are described as follows:

No. 2, 631 A., Martinez grant east of the Trinity, in Liberty Co., J. V. Lea, for .................... $ 63.10
No. 3, 621 A., of same to the same, for.. 68.10
No. 4, 618 A., of same to the same, for.. 61.80
No. 5, 269 A., Martinez, E. Trinity river, in Liberty Co., to J. V. Lea, for.. 29.59
No. 6, 684¾ A., same to the same, for.. 68.49
No. 7, 684 A., same to James Davis, for 61.52
No. 8, 684¾ A., same to G. B. Byrd, for .................... 61.62
No. 9, 1616 A., J. R. Jones, H. right in Angelina Co., to James Davis, for... 177.76
No. 10, 575 A., Rich'd Langham, H. R. in Haskell Co. formerly Cook Co., to J. A. McCardell, for............... 143.75
No. 11, 684¾, Martinez, W. Trinity, in Liberty Co., to A. E. Searcy ...... 68.47

From the foregoing report of sale it appears that J. V. Lea bought from the administrator at that sale four tracts of land out of the Martinez grant east of the Trinity river, these tracts being lot No. 2, 631 acres, lot No. 3, 621 acres, lot No. 4, 618 acres, and lot No. 5, 269 acres, these four tracts making a total acreage of 2,139 acres, while the total acreage in the Martinez grant east of the Trinity river, which the administrator had theretofore reported as unsold, and which the court ordered partitioned, and then afterwards ordered sold as above shown, was 2,145 acres.

And the said report of sale also shows that four other tracts of land out of the Martinez grants was sold at the same sale to four different purchasers, to wit: Lot No. 6, 684¾ acres, to J. V. Lea; lot No. 7, 684 acres, to James Davis; lot No. 8, 684¾ acres, to G. B. Byrd; and lot No. 11, 684¾ acres to A. E. Searcy; and the total acreage of said four tracts is 2,738¼ acres, which is only three-quarters of an acre less than the number of acres west of the Trinity river, in the Martinez grants, listed and described in the several reports of the administrator by the commissioners of partition and the orders of court above particularly mentioned, each of those reports and orders having described the unsold land in the Martinez grants west of the Trinity river as containing 2,739 acres.

As stated above, the said report of sale gives a description of the land sold in tabulated form, a part of said report of sale reading as follows:

No. 2, 631 A., Martinez grant east of the Trinity, in Liberty Co., J. V. Lea, for $63.10
No. 3, 621 A., of same to the same, for.. 68.10
No. 4, 618 A., of same to the same, for.. 61.80
No. 5, 269 A., Martinez, E. Trinity river, in Liberty Co., to J. V. Lea, for...... 29.59
No. 6, 684¾ A., same to the same, for.. 68.49
No. 7, 684 A., same to James Davis, for.. 61.52
No. 8, 684¾ A., same to G. B. Byrd, for 61.62
No. 11, 684¾ A., Martinez, W. Trinity, in Liberty Co., to A. E. Searcy, for... 68.47

Hermann v. Likens, 90 Tex. 449, 39 S. W. 282; MacManus v. Orkney, 91 Tex. 33, 40 S. W. 715; Kingston v. Pickins, 46 Tex. 101; Hurley v. Barnard, 48 Tex. 87; Pierson v. Sanger, 93 Tex. 163, 53 S. W. 1012; Taffinder v. Merrell, 95 Tex. 100, 65 S. W. 177, 93 Am.

St. Rep. 814; Smith v. Crosby, 86 Tex. 15, 23 S. W. 10, 40 Am. St. Rep. 818; Giddings v. Day, 84 Tex. 608, 19 S. W. 682; Kerlicks v. Keystone Land & Cattle Co., 21 S. W. 624; Perry v. Blakey, 5 Tex. Civ. App. 331, 23 S. W. 805; Cook v. Oliver, 83 Tex. 559, 19 S. W. 161; Cox v. Rust, 29 S. W. 808; Frazier v. Waco Bldg. Ass'n, 25 Tex. Civ. App. 476, 61 S. W. 134; Murphy v. Williams, 56 S. W. 696; Freeman v. Brundage, 57 Tex. 253; Robertson v. Johnson, 57 Tex. 66.

[1] After a careful consideration of appellants' assignments and the propositions thereunder, and the counter propositions of appellees, we are of the opinion that the action of the court in overruling same was correct, and the assignments are overruled.

[2] In their third assignment of error appellants challenge the action of the trial court, as follows:

"The court erred in admitting in evidence, over the objection of the plaintiffs, the testimony of the defendant J. V. Lea that he purchased of J. H. McCardell, administrator of the estate of James Davis, deceased, on the 9th day of October, 1875, lot 6, situated in Liberty county, Texas, out of leagues six and nine, J. D. Martinez surveys, bounded as follows: On the north by Lake Creek plantation and C. D. Creath tract, on the west by J. K. Davis 640-acre survey, on the south by C. B. McCardell and J. G. Searcy survey, and on the east by the Trinity river, and that a description of said land was obtained by making plat upon a blackboard on the date of sale, which plat was made by the administrator with the assistance of the defendant J. V. Lea, Green B. Byrd, and a surveyor named Albea, for the reason that there was no order of court and no report of sale by the administrator authorizing the sale of any property by that description, and there was no decree of confirmation of the probate court confirming such a sale by that description, as testified to by said witness, and further because the so-called report of sale which the defendant had previously introduced in evidence showed that lot No. 6, purchased by him, was situated east of the Trinity river and not west of the Trinity river, and therefore was not included within the grants of land in which said defendant claimed said land to be situated."

Under this assignment appellants make the following proposition:

"Where the report of commissioners described land west of the Trinity river as 2,739 acres, and the order of sale described the land the same way, and the report of sale showed sales, lot No. 2, 631 acres, to J. V. Lea, No. 3, 621 acres, to same, No. 4, 615 acres, to same, No. 5, 269 acres, to same, and No. 6, 684¾ acres, to same, all on the east side of the Trinity river, and the report of sale, which was of property of an estate of an ancestor who was common source of title, showed a sale of another 684¾ acres to an heir, situated on the west side of the Trinity river, deed to which was recorded, while the report showed no sale to the defendant of any land west of the Trinity river, and no deed was ever recorded showing any such sale, and the absence of a record could not be explained by the burning of the county records, which records were admittedly burned nearly twelve months previous to the sale by the administrator, it was error to allow the defendant to testify to a sale and supply the totally unsupported description in deed entirely by parol testimony of the defendant for specific 684¾ acres west of the Trinity riv-

er, which description would in fact contain 1,-421 acres of land."

Appellees' counter proposition is:

"The evidence was amply sufficient to sustain the judgment of the trial court against the appellants upon their action for the recovery of the land in controversy, and in favor of the appellee J. V. Lea upon his cross-action in trespass to try title, for all of the land sued for by Lea in said cross-action, as well as by plaintiffs in their petition, and, even though there be a substantial excess in the acreage adjudged to Lea by the judgment of the trial court, still the appellants in this action were not entitled to set aside the administrator's sale and recover this excess, for well settled is the rule in this state that, if there be a mistake regarding the number of acres included in a conveyance, an action to set aside the conveyance and recover an excess afterwards discovered is an equitable remedy, and cannot be maintained by the plaintiffs in a formal action in trespass to try title under our statute, nor asserted by the defendant in such an action under the plea of not guilty. The vendor must by specific suit demand the proper additional consideration for the excess, or, in the alternative, if that payment is not made, for recovery of the excess by asking for commissioners to make proper partition."

Without going into an extended consideration of the matter, on account of the length of this opinion already, and believing that no good purpose could be subserved thereby, we will simply say that it was proved by the testimony of J. V. Lea that he was present when the administrator sold the various tracts of land in the sale which occurred on October 5, 1875, and that he, in fact, purchased the land in controversy herein, and he testified that the administrator executed to him a deed for this land, and that he does not know what became of that deed, although he has searched for the same everywhere, and that the deed was signed and acknowledged by the administrator, and that the land sold to him thereby was described as lying between Lake Creek · plantation, J. K. Davis tract, C. B. McCardell tract, C. D. Creath tract, which is the Hume tract, and Trinity river and the Searcy tract.

"The J. K. Davis tract and the C. B. McCardell tract bounded this tract which was sold to me on the west; the Lake Creek plantation and the C. D. Creath tract bounded it on the north. Q. On the south, what tracts of land bounded the tract you bought? A. It was to be north of the Searcy tract. The sales were made in the order I have named, and on the day of sale, and reported to the court subsequent term of the court; that was the understanding, the next term of the court had to approve it. The C. B. McCardell tract lies to the south and a little to the west of the tract I bought; the Trinity river bounds on the east the tract that I bought."

And the land so described was further identified as the land in fact which the administrator sold to Lea at that time by other evidence, as has already been set out at length. This suit was filed by appellants simply as an action of trespass to try title for the same land, which, according to the testimony of Lea, above referred to, was sold to him by the administrator, and by cross-action the appellee J. V. Lea sued appellants in tres-

pass to try title for the same land, and the only plea by appellants in response to that cross-action was a general denial and plea of not guilty. Cavin v. Hill, 83 Tex. 76, 18 S. W. 323; Watts v. Howard, 77 Tex. 73, 13 S. W. 966; Willoughby v. Long, 96 Tex. 199, 71 S. W. 545; O'Connell v. Duke, 29 Tex. 300, 94 Am. Dec. 282; Ayres v. Duprey, 27 Tex. 604, 86 Am. Dec. 657; Groesbeeck v. Crow, 85 Tex. 200, 20 S. W. 49; Matthews v. Moses, 21 Tex. Civ. App. 494, 52 S. W. 114; Sanborn v. Bush, 41 Tex. Civ. App. 24, 91 S. W. 884; Fuller v. O'Neil, 69 Tex. 352, 6 S. W. 181, 5 Am. St. Rep. 59; Smith v. Olivarri, 127 S. W. 239; Parker v. Beavers, 19 Tex. 407; Mann v. Falcon, 25 Tex. 277; Nye v. Gribble, 70 Tex. 462, 8 S. W. 608; Daughtrey v. Knolle, 44 Tex. 455; Stark v. Homuth, 45 S. W. 762; Barnes v. Lightfoot, 26 Tex. Civ. App. 113, 62 S. W. 565; McCreary v. Douglass, 5 Tex. Civ. App. 492, 24 S. W. 367; Bennett v. Latham, 18 Tex. Civ. App. 403, 45 S. W. 935.

We have carefully gone over the matter, and, finding no merit in the assignment, it is overruled.

The fifth, sixth, and seventh assignments of error will be considered together, as follows:

(a) "The court erred in rendering judgment for the defendant because the undisputed evidence shows, and particularly the testimony of the defendant shows, by the map and plat introduced in evidence prepared by the witness A. Bush, that one connected tract of land could not be laid out and could not be surveyed having the Lake Creek plantation and the Creath or Hume tract for its northern boundary; such uncontradicted testimony having shown that the land in controversy is in two separate segregated tracts and parcels, hence the same could not be described by the administrator as lot six."

(b) "The uncontradicted testimony shows that at the time of the pretended sale to the defendant of 684¾ acres of land, that the administrator had no knowledge of any land belonging to the estate that was still unsold, located between the Searcy and the Hume or Creath survey, and the undisputed testimony further shows that the only remaining land, as contemplated by the administrator or known to him as still on hand and unsold out of which he could make a conveyance to the defendant Lea containing 684¾ acres, was situated in the western part of league No. six (6), and not out of the eastern part of said league; hence the court erred in rendering judgment for the defendant."

(c) "The uncontradicted testimony having shown that the defendant J. V. Lea never at any time claimed more than 684¾ acres of land as having been acquired from the estate of Jas. Davis, deceased, and the witness having further shown, in so far as the purported orders of sale were concerned, that said pretended sales were only made for the purpose of effecting a partition of said lands, therefore, if a sale of any kind was made to the defendant J. V. Lea of 684¾ acres of land, such sale was only for the purpose of partition, and at a time when it was understood by all parties concerned that the said defendant J. V. Lea was to receive in said partition 684¾ acres of land. Hence this court, sitting as a court of equity, erred in rendering judgment for the defendant for all of the land in controversy upon the uncontradicted testimony which showed that there is now included within the boundaries of the

land in controversy, consisting of two separate and distinct tracts, 1,421 acres of land. All the parties at interest at the time of said pretended administrator's sale had in contemplation that each of the purchasers of land which was sold on the first Tuesday in October, 1875, by the administrator out of leagues 6 and 9, if it was really intended that the defendant Lea was to acquire any land out of leagues 6 and 9, that there was only that quantity of land remaining to convey to the defendant J. V. Lea, and it would not be equity to uphold a sale of partition to J. V. Lea of 1,421 acres of land, the court therefore erred in rendering judgment from any standpoint of the case for all the land in controversy."

There are two propositions under these assignments, as follows:

(a) "Where the defendant claimed only 684¾ acres of land, and claimed to have bought it and received a deed for only that quantity, and where it is indisputably shown that the land in the limits pleaded by the defendant as cross-plaintiff is in two separate and segregated tracts, aggregating 1,421 acres, hence could not have been properly or lawfully described as lot six containing 684¾ acres, and especially where no land appears in the report of sale to have been sold defendant (cross-plaintiff) on the west side of the river, and no deed is shown to have ever been recorded, and the only evidence that it ever existed is the testimony of the defendant given after a lapse of more than forty years, and where land was sold to the defendant (if sold at all) out of a part of the league east of the river and a deed made to him therefor, and as shown by the evidence the administrator could not have had any knowledge, at the time of the sale, of any land being in existence between the Creath or Hume tract and the Annie E. Searcy tract on the west side of the river, which is the territorial limits now fixed by the defendant as the location of his land, and where it is evident, both from the circumstance of heirship and from the order of sale, that the sale was for the purposes of partition for a definite 2,739 acres, it was error, both in law and equity, for the trial court to adjudge to J. V. Lea, as against all the other heirs, 1,421 acres of land, which land is proven to be in two separate tracts and indisputably not included or forming any part of the 2,739 acres known to the administrator at the date of his report of 'unsold land,' on the ninth day of October, 1875, even if his right to 684¾ acres be, for the sake of argument, conceded, especially in view of the fact that he only claims to have bought and paid for 684¾ acres."

(b) "Where the administrator, selling land for the purposes of partition, sells in lots of so many acres, divided so as to represent in quantity the inheritable interest of each heir, and the administrator is in ignorance of the actual area of a very large body of land, and a part is sold as 684¾ acres, if the same was sold, but proves on later survey to be more than 1,400 acres, and the heir claiming it claims only to have bought 684¾ acres, and to have received deed to only that much, and has never claimed more, it was error to decree him the entire 1,421 acres as against the plaintiffs, who were heirs of the same common ancestor, and tenants in common with him of any land unsold, whether so unsold by design or by mistake, and this is true even though the party may claim not as heir in fact but as purchaser; as it is the law that, if there be in fact more land than there was thought to be and more than was sold, the excess belongs to the estate and to the heirs."

The counter proposition is as follows:

"Where the parties to a deed intended to buy and sell the land in gross without reference to quantity, or if the intention of the parties was to include in the deed all the land within given boundaries, and afterwards it is ascertained that the quantity is more than was estimated or regarded as in the tract when the deed was made, the fact that such excess exists is not ground for annulling the deed to the extent of allowing the vendor or his heirs to recover the excess."

As heretofore set out, this opinion has assumed such great length that it is impossible, in the present attitude, to go into detail answering the propositions under these assignments. Suffice it to say that we have examined the record with reference to same, and, finding no merit therein, the same are overruled. O'Connell v. Duke, 29 Tex. 300, 94 Am. Dec. 282; Daughtrey v. Knolle, 44 Tex. 456; Jordan v. Young, 56 S. W. 764; Hunter v. Morse's Heirs, 49 Tex. 219; Baker v. Light, 80 Tex. 629, 16 S. W. 330.

The appellants challenge the action of the lower court in their eighth assignment, as follows:

"The undisputed evidence having shown that the administrator undertook to sell 2,739 acres of the J. D. Martinez survey of land situated west of the Trinity river, in Liberty county, Texas, without adequate description, and the uncontradicted testimony having shown that at the time the said order of sale was entered and at the time the pretended sale was made there still remained unsold in said survey, west of the Trinity river, 4,160 acres of land, hence the title of the defendant, which he claims under administrator's sale, is not supported by any order of court or any proceeding giving a valid description of the land claimed to have been purchased by him. Wherefore the court erred in rendering judgment for the defendant."

The proposition under this assignment is:

"It was error to adjudge to appellee a total of 1,421 acres of land, or any part thereof, the evidence having conclusively shown that said 1,421 acres formed no part of the 2,739-acre tract known to the administrator as unsold land on the 9th day of October, 1875."

We have gone into this matter somewhat at length heretofore, and, without further investigation of the matter, we find no merit in the assignment, and it is therefore overruled.

[3] By the ninth assignment, it is claimed that the lower court erred in rendering judgment for the defendant for land situated on the west side of the Trinity river upon a report of sale undeniably describing land to the east of said river; that said court erred in locating said land and rendering judgment therefor out of the eastern part of said leagues 6 and 9, because there was in evidence a true and undisputed copy of an original map used by the administrator, which map plainly shows that there could not have in the mind of the administrator existed or been offered for sale any land in the eastern part of leagues 6 and 9, because said map shows no vacant land unsold, as of that date, in the eastern part of said leagues, while it plainly shows that there was sufficient unsold land in the western portion of said leagues to which said order of sale might have applied.

The proposition under this assignment is as follows:

"Where the land reported to have been sold by appellee was described as being on the east side of the Trinity river, and a deed thereto was made to him, and the land was resold by him, and the total amount of land reported by the administrator on the west side of the river was 2,739 acres, whereas it is now shown by the evidence in the case that there was in fact a total of unsold acreage as of October 9, 1875, of 4,160 acres, if there be indulged the assumption that the report of the administrator meant west side where it says east side of the river, then it is the most reasonable application of this order to locate Lea, Davis, and Byrd by placing their land where the administrator's map shows that there was unsold land at that date, where Byrd says that his tract was located, where the administrator says by his deed to Jack Davis, dated April 4, 1876, was located the James Davis tract, and where there was plainly exhibited on the administrator's map a tract of land shown as unsold of an aggregate acreage almost exactly equal to these three tracts of 684¾ acres each, and where it is further shown by both the inventory and map by which the administrator was guided, which was found in the administrator's papers of the estate, that he could not have had in mind that there was any unsold land of the estate on the eastern end of leagues 6 and 9, it was error to adjudge appellee 1,421 acres of land on the west side of the river, in two separate and disconnected tracts, out of leagues 6 and 9 and in east end thereof."

It is submitted as a counter proposition that, there being ample evidence to sustain the judgment of the trial court in favor of the appellee J. V. Lea for the tract of land sued for by him in his cross-action against appellants (it being also the same land sued for and described in the petition filed by appellants as plaintiffs in their action of trespass to try title against appellees), this court will not reverse that judgment, although it now appears that there is a substantial excess above 684¾ acres, which was the acreage estimated by the administrator when the sale was made by him to Lea on October 5, 1875, because appellants were not entitled to reform or set aside that conveyance and deed to Lea from the administrator by reason of such excess, this being simply a suit of trespass to try title, and not an equitable action to annul or reform a deed because of a mistake in the number of acres originally estimated to be in the tract of land conveyed.

We have heretofore discussed and gone over the same proposition, and without further discussion, and after an investigation of the record with reference to the matter, we find no merit in this assignment, and the same is overruled.

[4] By the tenth assignment the action of the lower court is called in question as being error in rendering judgment for the defendant upon the unsupported testimony of the wholly interested defendant, thereby establishing a predicate of authorizing and inviting any holder or beneficiary, under probate order and report of sale, after 40 years of unasserted title, to set up and support a pretended claim to lands of an estate, which, at the date of such order and report of sale, may have been shown to belong to the estate, unsupported by a single word in the record locating the land even as to its league grant, much less its detail description. This assignment is submitted as a proposition.

By counter proposition, it is argued:

"The testimony of J. V. Lea being admissible, it was for the trial court to pass upon the weight and worth of that testimony; and the trial court having accepted that testimony as helpful in proving what land was conveyed to Lea by the administrator, and how that land was described in the deed made to him by the administrator, there was no departure from the practice to accept parol testimony as sufficient to prove the existence and contents of a lost deed, after the proper predicate has been laid for the admission of such testimony, and it was only that course which the trial court followed when receiving and considering the testimony of J. V. Lea, along with the large amount of documentary evidence which served to assist in identifying and describing the land which in reality the administrator sold to J. V. Lea at the sale which occurred on October 5, 1875, and for which a deed to Lea was thereafter executed by the administrator and delivered to Lea."

As heretofore stated, and without going into detail, the testimony given by J. V. Lea, and also the probate proceedings and deeds, were offered in evidence as bearing upon the identification and description of the tract of land west of the Trinity river, which the administrator sold to J. V. Lea on October 5, 1875. We believe that there was no error in this action of the court, and the assignment is therefore overruled. Parks v. Caudle, 58 Tex. 220; Blanton v. Ray, 66 Tex. 61, 17 S. W. 264; Bounds v. Little, 75 Tex. 321, 12 S. W. 1109; Dolloney v. Womack, 1 Tex. Civ. App. 354, 19 S. W. 884, 20 S. W. 950; Daniels v. Creekmore, 7 Tex. Civ. App. 573, 27 S. W. 149; Simpson v. Edens, 14 Tex. Civ. App. 235, 38 S. W. 476.

It has been impossible in the consideration of this matter to go further into detail than has been done in this opinion. We are not unmindful of the fact that the profession does not take kindly to long opinions by the higher courts of this state, but in a case like the present, in which the record was so voluminous, and there was such a mass of testimony, it seemed impossible to the writer to get the matter in more compact shape than has been here presented.

[5] In this record, in many particulars, the testimony of Lea contradicted that of Mansfield, and also there was a slight contradiction between the testimony of Lea and Davis and Dr. W. K. McCardell; but those conflictions in the evidence are not material, and it was the province of the trial court to decide what worth and weight should be given to the testimony of the witnesses. It is evident to this court that the lower court regarded the testimony of J. V. Lea as being entirely worth of credence. There is testimony in the record which was believed by the lower court, and the action of the lower court in passing upon the same cannot be called in question in this court.

The mass of authorities and documents and the record which this court was compelled to go over in the decision of this case made it absolutely impossible, as heretofore said, to present the matters complained of in a more compact way than has been attempted in this opinion. Therefore the writer will add that while he regrets this and other opinions of this court which appear to be too lengthy, but also appear to be quite necessary for the decision of the causes, we feel that, in justice to both the appellant and appellee, their claims should have been set out. Their contentions have been made as clear as possible, and that the profession might know as to the merits of the controversy involved. It is needless to say that this has involved a great deal of labor, it occurs to us unneccesarily, and that these contentions and matters might have been presented in the briefs of the parties in a more concrete form, but, after a careful examination of the record and the holdings of the lower court, we have been unable to discover any error of such magnitude as will cause a reversal of this cause. It is therefore in all things affirmed.